In re Verdie Nell **NEVILLE, Deceased.**

No. 06–00–00168–CV.

Court of Appeals of Texas, Texarkana.

Submitted Jan. 3, 2002.

Decided Jan. 30, 2002.

John R. Mercy, Mercy, Carter, Tidwell & Elliott, LLP, Texarkana, J. Ken Nunley, Nunley, Davis Jolley & Hill, LLP, Boerne, for appellant.

Troy A. Hornsby, Miller, James, Miller & Hornsby, LLP, Texarkana, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

In this will contest, Charles Neville and Paulette Knapp appeal from the trial court's judgment which held that Verdie Neville did not have testamentary capacity on July 9, 1998, at the time she signed a will, and ordered that a will Verdie Neville executed in 1992 should be admitted to probate instead of her 1998 will. Charles Neville and Knapp contend that the evidence is factually and legally insufficient to support the trial court's finding that Verdie Neville lacked testamentary capacity when she executed the will of July 9, 1998.

In order to make a valid will, Verdie Neville must have been of sound mind when she signed the will. *See* TEX. PROB. CODE ANN. § 88(b)(1) (Vernon 1980). Texas courts define the term "sound mind" to mean "testamentary capacity."

Testamentary capacity means sufficient mental ability to understand the business in which the testatrix is engaged, the effect of her act in making the will, and the general nature and extent of her property. The testatrix must be able to know her next of kin and the natural objects of her bounty, and she must have a sufficient memory to collect in her mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them. *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *In re Estate of Jernigan*, 793 S.W.2d 88, 89 (Tex.App.-Texarkana 1990, no writ); *Lowery v. Saunders*, 666 S.W.2d 226, 232 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.). As proponents of the July 9, 1998 will, Charles Neville and Knapp had the burden to show that Verdie Neville had the requisite testamentary capacity on July 9, 1998, the day she signed the will. *See Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex.App.-Houston [1st Dist.] 1996, no writ).

When an appellant attacks the legal sufficiency of an adverse fact finding on an issue for which he had the burden of proof, he must demonstrate that the evidence established the contested issue as a matter of law. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In its analysis, the reviewing court must examine the record for evidence that tends to support the finding, while disregarding all evidence and inferences to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the trial court's finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *See id.*

Charles Neville and Knapp make a very narrow argument in this case. They contend that because there is direct evidence of Verdie Neville's mental state on July 9, 1998, evidence of her mental condition on surrounding dates cannot override that direct evidence, or even be considered as proof of her condition on that particular date.

Charles Neville and Knapp rely on *Lee v. Lee*, 424 S.W.2d 609 (Tex.1968), to support their position. In that case, a jury found that an eighty-eight-year-old testator did not have testamentary capacity. The witnesses to the execution of the will testified that Lee was competent when he signed the will. The jury did not believe that testimony, instead believing other testimony-not about his condition on that exact date-but instead describing the testator's dementia as exhibited over a period of years. The court of appeals concluded that the contestant's evidence about Lee's prior mental condition only created a suspicion of incapacity at intermittent periods not associated with the date of the execution of the will. The Texas Supreme Court reversed the judgment of the court of appeals, finding that there was some evidence that Lee was of unsound mind on the date he signed the will. The Supreme Court refused to address the factual sufficiency question because that was within the sole purview of the court of appeals.

Charles Neville and Knapp point to the following language in the *Lee* opinion:

> Since there is no direct testimony in the record of acts, demeanor or condition indicating that testator lacked testamentary capacity on October 2, 1961, testator's mental condition on that date may

be determined from lay opinion testimony based upon the witnesses' observation of testator's conduct either prior to or subsequent to the execution.

*Id.* at 424 S.W.2d 609. They posit that evidence about a testator's mental condition before or after the signing of the will may be given probative effect *only* if there is no direct evidence of the testator's mental soundness on the actual date the will was executed. We disagree.

We do not believe the Supreme Court meant to say in *Lee* that it is only when there is no direct evidence of the testator's mental soundness on the date the will was actually signed that evidence of the testator's mental condition on other dates may be used. Instead, we believe the court was saying that *although* there was no direct evidence of the testator's mental condition on the date of execution, the jury's verdict could still be sustained by the evidence about Lee's mental soundness on the other dates before and after the will's signing. This has been the rule in Texas for many years and is confirmed by the Texas Supreme Court's decisions in *Croucher v. Croucher,* 660 S.W.2d 55 (Tex. 1983), and *Carr v. Radkey,* 393 S.W.2d 806 (Tex.1965), where probative effect was given to evidence of the testator's mental soundness on both the date of the execution of the will and at times prior to the date the will was executed. It has always been the rule in Texas that, although the proper inquiry is whether the testator had testamentary capacity at the time he executed the will, the court may *also* look to the testator's state of mind at other times if those times tend to show his state of mind on the day the will was executed. Evidence pertaining to those other times, however, must show that the testator's condition persisted and probably was the same as that which existed at the time the will was signed. Whether the evidence of testamentary capacity is at the very time

the will was executed or at other times goes to the weight of the testimony to be assessed by the fact finder. *See Croucher v. Croucher,* 660 S.W.2d 55; *Carr v. Radkey,* 393 S.W.2d 806; *Bracewell v. Bracewell,* 20 S.W.3d 14; *Horton v. Horton,* 965 S.W.2d 78, 85 (Tex.App.-Fort Worth 1998, no pet.).

Moreover, there is evidence in the form of expert opinions from two doctors who testified that Verdie Neville had a brain tumor that adversely affected her mental soundness, that it was getting progressively worse before the execution of the July 9, 1998 will, and that in their opinions it deprived her of testamentary capacity. One of the doctors, Dr. Nathan Wright, who was Verdie Neville's regular physician, testified that in his opinion her condition was such that it continued to deteriorate and that she did not have testamentary capacity on July 9, 1998, when she signed the will. Dr. Patterson, a neurosurgeon who performed surgery on Verdie Neville, testified that when he discharged her on June 26, 1998, he thought it highly unlikely that she was able to understand the business associated with executing a will and that her condition would continue to deteriorate. Dr. Patterson testified there was some question in his mind as to whether Verdie Neville understood everything involved when she signed a consent to treatment from him, that her brain tumor affected her ability to transact business, and that her condition would continue to deteriorate. He examined her on June 26, 1998, and testified he thought it highly unlikely that she had the ability to understand the business associated with executing a will. Dr. Patterson's last contact with Verdie Neville was about two weeks before she signed the July 9, 1998 will.

We are left, then, with the application of these facts and these well-settled princi-

ples to determine the legal and factual sufficiency of the evidence to support the trial court's findings.

■ We first look at the evidence tending to support the court's finding that Verdie Neville did not have testamentary capacity on July 9, 1998. Dr. Wright testified that when he saw her on June 3, 1998, she was complaining of short-term memory loss over the previous two months and that she had been diagnosed with a malignant brain tumor. He testified that she had difficulty deciding what words to use, she forgot where she had left items, and she would sometimes reverse sentences when speaking. He testified that her prognosis was for a progressively worsening dementia and that at the time of her visit, her mental capabilities were diminished. He also testified that based on a reasonable medical probability, she did not have the mental capacity to execute a will one month later, on July 9, 1998.

James Verschoyle, the attorney who prepared a prior will for Verdie Neville, testified that he refused to draft the new will signed on July 9, 1998, because he did not think she was competent. He also testified that he believed she was not of sound mind.

Larry Neville, Verdie Neville's nephew, worked for his aunt and testified that she began having difficulties with her memory and decision making around September 1997, and that based on his observations in June and July 1998, he believed she did not have the mental capacity to make an informed decision. Two granddaughters testified that they visited Verdie Neville in June and July 1998, and they believed she was not mentally cognizant at that time.

Byron Terry was a business partner of Verdie Neville, and he witnessed another will she signed on April 1, 1998. He testified that he wanted his name "off that will" because he did not believe she was competent at that time. He also testified that he thought Verdie Neville was not competent to make a will "in July 1998." Terry, however, took a deed from Verdie Neville, which she signed on July 1, 1998, that partitioned some property they jointly owned.

Barbara Skelton, a neighbor, testified that she saw Verdie Neville regularly for the last month of her life, from June 14 until July 15, that Neville was not coherent all the time and did not have decision-making ability, and that she believed Verdie Neville did not have the ability to understand the effect of her actions or the general nature and extent of her property.

This clearly constitutes some evidence to support the trial court's determination that Verdie Neville was not competent when she signed the July 9, 1998 will. The remaining question is whether this evidence is overridden by the great weight of the contrary evidence.

Charles Neville, Verdie Neville's son, testified that he was a witness to the July 9, 1998 will, and that on that day his mother was capable of conducting business transactions and was aware of her property and estate, that she had discussed her assets, met with her bankers, and executed a deed just before she signed the will.

Tonya Qualls, a notary public, testified that Verdie Neville was in her recliner and pretty much alert on the day she signed the July 9, 1998 will; that Charles Neville did not participate in the will signing; that Verdie Neville told her attorney, Edwin Buckner, that she wanted Charles Neville to have everything; and that she was responsive to Qualls' conversation, knew she was making a will, and understood its effect.

Katy Griffin, a college student who witnessed the will, testified that she thought Verdie Neville knew what she was doing when she signed the will.

Anna Rickart, a nurse, testified that she sat with Verdie Neville and that Neville was able to feed herself, was able to talk about what she wanted to eat, and Rickart knew of no reason why Verdie Neville would not be able to conduct business.

Faye Clayton, a retired employee of Guaranty Bank and a friend of Verdie Neville, testified that she visited with Neville about Neville's accounts in June 1998, and that Neville had no apparent mental incapacity at that time.

Sandra Hall, a branch manager of Guaranty Bank, testified that she visited with Verdie Neville in her office at the bank on June 22, 1998, that at that time Verdie Neville was able to transact business and carry on an intelligent conversation, and that on July 1, 1998, she and Verdie Neville discussed changing Neville's will.

Don Sewell was a witness to the will. He testified that he talked with Verdie Neville and that she was lucid, appeared to have clear thought patterns, and clearly stated that she intended to leave her entire estate to her son, Charles Neville. He believed Neville was competent and coherent.

Doris Fitts, a friend of Verdie Neville, testified that she visited with her until two days before Neville's death and that Neville was able during that time to understand her business transactions and "knew what she was talking about."

Sylvia Styles, a sitter hired to stay with Verdie Neville, testified that Neville was able to converse and specify the foods she wanted to eat, that Neville was "real alert" just before her death, and that she felt Neville was competent until the time she died.

From this recitation of the testimony, it is clear that the evidence is conflicting. In such a situation, the trier of fact is entitled to accept or reject any testimony, resolve conflicts in the testimony, and decide the weight to be given to the testimony. On this record, we cannot say that the evidence is factually insufficient to support the trial court's finding or that the trial court's finding is against the great weight and preponderance of the evidence.

We affirm the trial court's judgment.