In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00064-CV


______________________________




CHARKITA L. JOHNSON-MOSS, Appellant



V.



FREDDIE M. PULLUM AND TERESA E. PULLUM, Appellees




 


On Appeal from the County Court at Law II


Gregg County, Texas


Trial Court No. 2008-2219-CCL2




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Charkita L. Johnson-Moss filed her pro se notice of appeal on June 12, 2009, from a
judgment which she states was rendered against her on March 30, 2009. The clerk's record was due
to be filed on or before May 29, 2009. Appellant is not indigent, and is thus responsible for paying
or making adequate arrangements to pay the clerk's fees for preparing the record. See Tex. R. App.
P. 37.3(b). 

 On September 1, 2009, we contacted Johnson-Moss by letter, reminding her that the record
was more than ninety days past due, and warning that, if we did not receive an adequate response
within ten days, we would dismiss the appeal for want of prosecution pursuant to Rule 42.3(b)
and (c) of the Texas Rules of Appellate Procedure. See Tex. R. App. P. 42.3(b), (c).

 As of the date of this opinion, we have received no response. The record is now over 145
days past due. 

 We dismiss the appeal for want of prosecution.



 Bailey C. Moseley

 Justice


Date Submitted: October 22, 2009

Date Decided: October 23, 2009




t have testamentary capacity at the time she executed the 2007 Will. However, we
affirm the trial court's order denying LeGrand's application to probate the 2007 Will because there
is sufficient evidence supporting the trial court's finding of undue influence. 

II. Testamentary Capacity to Execute the 2007 Will

 In her first point, LeGrand argues that the evidence is legally and factually insufficient to
support the trial court's finding that Reno lacked testamentary capacity at the time the 2007 Will was
executed. We find that the evidence supporting the judgment was factually insufficient. 

 A. Standard of Review 

 When reviewing a legal sufficiency challenge, we review the evidence in the light favorable
to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary
evidence unless reasonable jurors could not. In re Estate of Wilson, 252 S.W.3d 708, 713 (Tex.
App.--Texarkana 2008, no pet.) (citing City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)). 
We may overrule the trial court's ruling only if the evidence conclusively establishes, as a matter of
law, that Reno had capacity. See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001). The
test is whether the evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review. City of Keller, 168 S.W.3d at 827. In reviewing LeGrand's legal sufficiency
challenge to the trial court's finding of lack of capacity to execute the 2007 Will, we will sustain
appellants' complaint if the record reveals (1) the complete absence of a vital fact; (2) the court is
barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence
conclusively establishes the opposite of the vital fact. See id. at 810. More than a scintilla of
evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people
to differ in their conclusions. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).

 For a factual sufficiency challenge, we must consider and weigh all the evidence in the
record, both supporting and against the finding, to decide whether the verdict should be set aside. 
Dow Chem. Co., 46 S.W.3d at 242. In reviewing appellant's factual sufficiency challenge, we will
set aside the judgment only if the finding is so against the great weight and preponderance of the
evidence as to be clearly wrong and manifestly unjust. Id.; Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986).

 B. Proof Required for Testamentary Capacity 

 LeGrand, as the proponent of the 2007 Will, has the burden of proving Reno had
testamentary capacity at the time she executed the 2007 Will. See Croucher v. Croucher, 660
S.W.2d 55, 57 (Tex. 1983); Long v. Long, 196 S.W.3d 460, 464 (Tex. App.--Dallas 2006, no pet.). 
"Testamentary capacity" means sufficient mental ability, at the time of execution of the will, to
understand the business in which the testator is engaged, the effect of his or her act in making the
will, and the general nature and extent of his or her property. In re Neville, 67 S.W.3d 522, 524
(Tex. App.--Texarkana 2002, no pet.); see Long, 196 S.W.3d at 464; In re Estate of Grimm, 180
S.W.3d 602, 605 (Tex. App.--Eastland 2005, no pet.). The testator must be able to know his or her
next of kin and the natural objects of his or her bounty, and the testator must have a sufficient
memory to collect in his or her mind the elements of the business to be transacted and to hold them
long enough to at least perceive their obvious relation to each other and be able to form a reasonable
judgment about them. Id.; In re Estate of Jernigan, 793 S.W.2d 88, 89 (Tex. App.--Texarkana
1990, no writ). 

 In a will contest on the ground of testamentary incapacity, the proper inquiry is the condition
of the testator's mind on the day the will was executed. In re Estate of Trawick, 170 S.W.3d 871,
877 (Tex. App.--Texarkana 2005, no pet.). The court's finding on the issue of testamentary capacity
may be based on evidence of the testator's mental condition on the date of execution or on evidence
of the testator's mental soundness before and after the date of the will's signing. Neville, 67 S.W.3d
at 525 (citing Croucher, 660 S.W.2d at 55; Carr v. Radkey, 393 S.W.2d 806 (Tex. 1965)). 

 However, evidence of incompetency at other times only has probative force if that evidence
demonstrates that the testator's previous or subsequent condition persists and "has some probability
of being the same condition which obtained at the time of the wills [sic] making . . . ." Trawick, 170
S.W.3d at 876 (quoting Lee v. Lee, 424 S.W.2d 609, 611 (Tex. 1968)). 

 C. Evidence of Testamentary Capacity 

 There is evidence that Reno was not always alert and was at times confused and forgetful on
certain days before and after the 2007 Will was executed. In January 2007, a social service
assessment history stated that Reno was "Alert as to self. Place, time and situation is off most of the
time. Long-term memory appears intact, but short-term deficits and confusion and forgetfulness." 
Miguel Repress, the director of physical therapy at the Heritage Nursing Home where Reno resided
at the time of execution of the 2007 Will, testified that Reno had "some cognitive deficits" and, at
times, was "incoherent" or did not understand who he was, who she was, or what was going on. 
Memory Parker, a hospice LVN, visited Reno at least twice every week from September 2006
through the summer of 2007. Parker admitted there were times when Reno was "not very alert." 
Repress agreed with a social services' assessment that in April 2007, Reno's "mental function varies,
some days appears to be lucid, others severely impaired--poor judgment and decision making
ability." 

 But as to her condition on the day the will was executed, Repress testified Reno was coherent
and was "coherent at the time of this Will signing." He testified Reno appeared to be listening to
what was going on, understood she was signing a will, and was not confused at any time during the
signing process. 

 Kathy Hayes (Hunt) was the notary public who notarized the signatures of Reno and the
witnesses on the 2007 Will. Here, Hayes scanned through the will herself and read that LeGrand
would get all the property on Reno's death. Hayes did not read the will to Reno, but, with LeGrand
outside the room, Hayes reviewed parts of the will with Reno and spoke with her to ensure she
(Reno) knew what she was signing and what was in the will. Hayes testified that Reno knew "that
[Hayes] was going to be witnessing [Reno's] signature on a Will" and "that Jan was to manage
everything, you know, after [Reno] dies, manage -- be a hundred percent responsible and get any
extra stuff that -- after everything is paid." Repress was present when Hayes reviewed the will with
Reno. On cross-examination, Hayes admitted she was unaware that Reno suffered from confusion,
anxiety, or depression, or that Reno was regularly taking pain medication. 

 Hayes testified that she has notarized numerous wills in the past and that if a testator is
confused, cannot sign the document, or does not know what he or she is talking about when she
(Hayes) explains the will to them, Hayes will refuse to notarize it and will advise the family to get
a guardian appointed over the testator. In this case, throughout the will execution process, Reno
never became incoherent or disoriented, and Hayes never had to redirect Reno's attention. Based
on Hayes' observations and conversation with Reno, Hayes believed Reno understood the provisions
of the 2007 Will. 

 Parker was an LVN that visited Reno through hospice. For several months before and after
the execution of the 2007 Will, Parker visited Reno at least twice a week, both in her home and in
the nursing home. Reno's primary health problems during this period were pain control and
respiratory issues. Parker admitted there were times when Reno was "not very alert"; however, she
believed Reno was always aware of where she was and what was going on. Nursing home records
indicated that at times, Reno refused to be turned, threw the aides out of her room, complained about
the food being cold, and refused to go to physical therapy. Parker described Reno as a "very
strong-willed" woman, with a mind of her own, who would not do something she did not want to
do. Parker admitted that she and the hospice caregivers "babied" Reno and that Reno did not like
the level of care she received from the nursing home. 

 Reno specifically told Parker about her final wishes, including very small details about
funeral arrangements, what she wanted said, the pastor she wanted there, and the color of her
earrings, ring, and dress. Parker visited Reno the day before the 2007 Will was executed, and Parker
described Reno's condition as "fairly well that day." Parker testified that at that time, she knew
Reno was "reviewing her Will." Another visit occurred three days after the will was executed, and
Parker described Reno as "high spirited . . . very upbeat, very cheerful, one of those days when she
felt she could conquer the world." From her frequent and regular contact with Reno, Parker believed
Reno understood: 1) her own personal finance and business dealings; 2) what property she owned
and what property she still maintained at that time; and 3) who her relatives and next of kin were. 

 Wayne McKay, a hospice chaplain, visited Reno at least once every week from August 2006
through the summer of 2007. In addition to praying with Reno and providing scripture and counsel,
they conversed about local and world events, horses, dogs, and family. He described Reno as "very
straightforward," someone who never held back what she was feeling or what she thought of
something, and someone who would bluntly express what she thought of someone else, including
her nursing home caregivers and her family. Reno told him there was discord amongst her family
members. 

 When asked about Reno's memory, McKay testified that Reno regularly worked crossword
puzzles and was able to remember events of the past month, his prior visits, as well as those visits
he missed. On the day before the execution of the 2007 Will, McKay visited Reno and did not note
anything wrong with her, instead noting that it was a "good visit in prayer." (2) During the spring of
2007, he believed Reno had the ability to "know and understand her personal finances, her personal
business, [and] that she could comprehend and understand what [property] she had and didn't have." 
McKay "never had any question about" Reno's mental capacity, and saw her as "always, I thought,
very alert and sharp." He could only recall one "very rare" instance where he had to reorient Reno
to the proper time or place. 

 D. Analysis of the Evidence of Testamentary Capacity 

 Here, all the direct evidence regarding Reno's mental capacity on the day the 2007 Will was
executed indicates Reno had sufficient testamentary capacity to understand and execute the 2007
Will. There is no evidence she was confused or incapacitated in any way on that day. (3) Throughout
the last year of Reno's life, Parker and McKay visited her several times every week, and they
testified that Reno's episodes of confusion were rare and that she routinely had sufficient
testamentary capacity. (4) There is evidence that Reno lacked full capacity at times before and after
the 2007 Will was executed; however, there is little probative evidence that her incapacitating
condition persisted on the day the 2007 Will was executed.

 Based on Reno's previous days of confusion and disorientation, there may be a scintilla of
evidence of her incapacity, making it legally sufficient, but the testimony of all witnesses who
observed the execution of the will and Reno's condition on the day the will was signed was that she
had the requisite testamentary capacity to execute the will on the date she signed it. Therefore, the
finding that Reno lacked testamentary capacity is so against the great weight of the evidence as to
be clearly wrong and unjust. The evidence supporting the finding is factually insufficient, and we
sustain LeGrand's first point of error.

III. Undue Influence 

 In her second point of error, LeGrand contends the evidence is legally and factually
insufficient to support the trial court's finding that the 2007 Will was the product of undue influence. 
We disagree.

 To justify setting aside a will because of undue influence, a contestant must prove (1) the
existence and exertion of an influence (2) that subverted or overpowered the mind of the testator at
the time of execution of the instrument (3) so that the testator executed an instrument he or she
would not otherwise have executed but for such influence. Rothermel v. Duncan, 369 S.W.2d 917,
922 (Tex. 1963); In re Estate of Steed, 152 S.W.3d 797, 807 (Tex. App.--Texarkana 2004, pet.
denied); Mackie v. McKenzie, 900 S.W.2d 445, 449-50 (Tex. App.--Texarkana 1995, writ denied). 
We must begin with the proposition that a person of sound mind has a perfect right to dispose of his
or her property as he or she wishes. Rothermel, 369 S.W.2d at 923. Therefore, the burden of
proving undue influence is on the party contesting its execution. Id. at 922. To succeed, the party
claiming undue influence must introduce some tangible and satisfactory proof of the existence of
each of the above stated elements of undue influence. Scott v. Townsend, 106 Tex. 322, 166 S.W.
1138 (1914).

 The Rothermel decision establishes that the general topics examined to prove an influence
was undue are: the relationship existing between the testator and the parties, the opportunities for
an exertion or deception, the circumstances surrounding the drafting and execution of the will, the
existence of a fraudulent motive, and any domination of the testator by another. 

 To prove whether the testator's free will was subverted or overcome, we examine the
testator's mental or physical incapacity to resist or susceptibility to influence. Weakness of mind
or body are relevant inquiries.

 Finally, in inquiring if the will would not have been executed but for such influence, we
review whether the will as executed was unnatural in its disposition of property. Rothermel, 369
S.W.2d at 923. 

 One may request, importune, or entreat another to create a favorable dispositive instrument,
but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the
maker, they will not taint the validity of the instrument. Id. at 922.

 Other topics usually examined are the motive, character, and conduct of the person
benefitting from the will, the words, and acts of the parties. Mackie, 900 S.W.2d at 449; Green v.
Earnest, 840 S.W.2d 119, 122 (Tex. App.--El Paso 1992, writ denied). 

 Because the exertion of undue influence is usually subtle, and by its very nature usually
involves an extended course of dealings, contacts, and circumstances, undue influence may be
proven by direct and circumstantial evidence. Rothermel, 369 S.W.2d at 922. In the absence of
direct evidence, we should consider all of the circumstances shown or established by the evidence. 
Id. Even though none of the circumstances standing alone would be sufficient to satisfy the elements
of undue influence, if when considered together the circumstances produce a reasonable belief that
an influence was exerted that subverted or overpowered the mind of the testator and resulted in the
execution of the testament in controversy, the evidence is sufficient to sustain such conclusion. 
Barksdale v. Dobbins, 141 S.W.2d 1035 (Tex. Civ. App. 1940, writ ref'd). A solemn testament
executed under the formalities required by law by one mentally capable of executing it should not
be set aside on a bare suspicion of wrongdoing. Rothermel, 369 S.W.2d at 922-23; Burgess v.
Sylvester, 143 Tex. 25, 182 S.W.2d 358 (1944). Therefore, the circumstances relied on as
establishing the elements of undue influence must be "of a reasonably satisfactory and convincing
character, and they must not be equally consistent with the absence of the exercise of such
influence." Rothermel, 369 S.W.2d 922; Stewart v. Miller, 271 S.W. 311 (Tex. Civ. App.--Waco
1925, writ ref'd).

 A. The Existence and Exertion of an Influence

 1. The nature of the relationship of Reno and her children. 

 Reno's relationship with Freeman and Tappan was strained. In July 2006, Freeman and
Tappan filed a guardianship action seeking to have a guardian appointed over Reno. Reno was so
upset on receiving notice of the guardianship action that she "called the police on" Tappan and
remained upset about it well into the fall of 2006, even after the guardianship action was dropped. 

 Before Reno's placement in the nursing home, Reno lived within walking distance of
Tappan, but Reno had repeatedly accused Tappan and her children of stealing from her. In response
to the accusations, in a letter dated October 3, 2006, Tappan made clear that neither she nor her
children would "set foot on [Reno's] property again" and threatened to file harassment charges
against Reno if the accusations did not cease. Despite having visited Reno frequently before the
incident, Tappan did not see Reno again after mailing the October letter. 

 There was also long-standing conflict between the children of Reno's first marriage, Brown,
Freeman, and Tappan, and the child of Reno's second marriage, LeGrand. Reno was very concerned
about the conflict among and between her children. That animosity concerned Reno to the point she
told McKay about the conflict and even noted it in her 2001 Will. Reno never indicated she wanted
to further separate the children. Therefore, there is evidence of conflict between LeGrand and the
children of Reno's first marriage as well as evidence that Reno was upset with Freeman and Tappan. 
This factor shows no exertion of undue influence.

 2. The opportunity to exert undue influence. 

 From October 2006 until Reno's death in February 2008, LeGrand was Reno's primary
visitor, support, and nonprofessional caregiver. LeGrand exercised a great deal of control over the
healthcare that Reno received, even choosing Reno's nursing home. Until October 2006, before
entering the nursing home, LeGrand and her half-sister, Tappan, ensured Reno's bills were paid by
writing checks on Reno's account and having Reno sign them. After October 2006, LeGrand wrote
the checks for Reno to sign. LeGrand acknowledges she was the only party in this case that had any
contact with Reno from October 2006 until Reno's death in February 2008; she did not tell Freeman
or Tappan of Reno's location during that time and requested the staff not to reveal information about
her mother. LeGrand testified this was done at her mother's request. For whatever reason, LeGrand
had exclusive access to Reno for several months and, therefore, an unlimited opportunity to exert
influence on Reno. 

 3. The circumstances of preparation and execution of the 2007 Will. 

 LeGrand testified that Reno wanted to "make a will" and "to leave everything to [her]." 
Reno handwrote her two previous wills and their codicils, but LeGrand drafted the 2007 Will, which
leaves everything to her, and arranged for its execution at the nursing home. Multiple witnesses
attested that Reno was "mentally competent and under no constraint or undue influence." With
LeGrand out of the room, Hayes discussed the 2007 Will with Reno and presided over its execution. 
LeGrand cites our decision in Steed, 152 S.W.3d at 809, for her argument that "even the existence
of some controlling influence by [her] over [Reno] is not sufficient to invalidate the 2007 will unless
the influence was specifically exerted on the testamentary act." In Steed, there was some evidence
that the testator personally drafted a holographic will in order to pacify his wife, who was accused
of undue influence. Id. at 807-08, 811. All the evidence indicated that the testator drafted the will
"alone," while his wife was in a different city. Id. at 809. Here, LeGrand wrote the will and had
constant contact with the testator, Reno. The facts that LeGrand prepared the 2007 Will and that she
had constant contact with Reno at the time the 2007 Will was prepared and executed markedly differ
from the facts present in Steed, and, therefore, Steed is distinguishable. 

 While LeGrand did not physically cause Reno to sign the will, she did personally prepare the
will for Reno. A will may not be executed until someone prepares it; one element of the
consummation of a will is the physical preparation of the will that is signed by the testator. 
Testimony of the "making of the testament itself" may provide evidence of exertion of an undue
influence. Rothermel, 369 S.W.2d at 923. 

 While the physical execution of the will shows no undue influence, the fact that LeGrand
personally prepared the will without the intervention of an attorney or other third party is significant. 
Boyer v. Pool, 154 Tex. 586, 280 S.W.2d 564, 566 (1955) ("Proof of the planning and preparation
of the will, where the witnesses are available, is the heart of an undue influence case."). This
important fact is extremely persuasive in finding the exertion of influence by LeGrand. 

 4. Reno's dependency on LeGrand. 

 Reno was in declining mental and physical health for more than the last two years of her life.
Before Reno entered the nursing home, LeGrand was her primary visitor and nonprofessional
caregiver. Tappan and LeGrand often wrote checks on Reno's account in order to get Reno's bills
paid. When LeGrand placed Reno into the nursing home, she did not notify any other family
members, and directed the nursing home not to release any information about Reno being a resident
there. Reno's best friend and half-sister both visited Reno in the nursing home, and LeGrand
instructed both of them to keep her location a secret. LeGrand testified that withholding information
about Reno's whereabouts was Reno's decision. This factor weighs in favor of the finding of undue
influence.

 When taken together, these facts support the finding of an existence and exertion of an
influence by LeGrand over Reno. The proof must also show that the influence operated to subvert
or overpower the testator's mind. 

 B. Subvert or Overpower Reno's Mind--Susceptibility to Influence 

 An important factor in determining if the testator's will was overcome is the testator's mental
and physical condition and the susceptibility of the testator to an undue influence. Rothermel, 369
S.W.2d at 923. At the time the 2007 Will was executed, Reno was in a somewhat weakened
physical and mental condition--she was eighty years old, resided in a nursing home, under hospice
care, and suffered from occasional episodes of mental disorientation and confusion. However, as
previously noted in this opinion, the direct evidence from the notary and witnesses present on the
day the 2007 Will was executed uniformly indicate that Reno had sufficient testamentary capacity.

 LeGrand testified that most of the time Reno "was right there with you" mentally, but in the
fall of 2006, when she asked Reno about making a will, Reno would mentally "shut down" for a
couple of days. In contrast, LeGrand, McKay, and Parker all testified that Reno was very
straightforward and was always able to tell you what she wanted and had sufficient capacity to
understand and execute the 2007 Will. 

 While we have held that the evidence does not support a finding that Reno lacked the
testamentary capacity to execute the will, the facts demonstrate that she was in a weakened
condition, subject to hospice care, and at times was not fully cognizant of all events. We find this
evidence is some circumstantial evidence of a susceptibility to an undue influence. 

 C. Execution of a Will She Would Not Otherwise Have Executed

 The most important factor in determining if the will was one the testator otherwise would not
have executed is the unnatural disposition. Id. Here, the 2001 Will, the 2002 Codicil, the 2004 Will,
and the 2005 Codicil made numerous specific bequests and devises to each of Reno's four children,
each of her thirteen grandchildren, as well as hospitals, a church, and pastor. However, the 2007
Will effectively leaves all of Reno's property to LeGrand. A person of sound mind has a perfect
legal right to dispose of his or her property as he or she wishes, and the 2007 Will makes a 
disposition of the property where one child is preferred over the other children and grandchildren. 
But where a reasonable explanation for such unnatural disposition is present, an unnatural
disposition is understandable. McKenzie, 900 S.W.2d at 450 (citing Rothermel, 369 S.W.2d at 924). 
Here, there is evidence that one daughter had severed all ties with Reno and that Reno was upset at
the attempt to obtain a guardianship. While one may decide to change his or her will without undue
influence, the fact is that LeGrand prepared this self-serving will. While we do not find that the
disposition of Reno's property by this will is unnatural, in light of the animosity with some family
members, it is completely different from previous wills in the sense that certain other family
members and charities to whom she had previously devised property were completely omitted. This
factor alone does not show an undue influence, but is only one of the many facts that combine to
allow the trial court to reach such a conclusion. See Cobb v. Justice, 954 S.W.2d 162, 166 (Tex.
App.--Waco 1997, pet. denied).

 When viewed in light of the applicable law, the evidence supporting the trial court's finding
of undue influence is more than a scintilla and such finding is not against the great weight of the
evidence in this case. Therefore, there is legally and factually sufficient evidence to support the trial
court's finding of undue influence. 

 Since we uphold the trial court's conclusion that the 2007 Will was produced as a result of
an undue influence, we affirm the judgment of the trial court. 




 Jack Carter

 Justice


Date Submitted: November 3, 2009

Date Decided: December 18, 2009

1. After the 2001 Will and the Codicil, Reno drafted another holographic will dated June 14,
2004 ("2004 Will") and a handwritten codicil dated March 9, 2005 ("2005 Codicil"). The provisions
of the 2004 Will and 2005 Codicil are similar to those of the 2001 Will and Codicil. There is no
evidence in the record that either the 2004 Will or the 2005 Codicil were submitted for probate.
2. McKay testified that his written notation of a "good visit" meant that "everything was okay
to [him.]" 
3. Testimony and Reno's medical records indicate that on or about the time she executed the
2007 Will, Reno suffered from anxiety and depression and was taking or was prescribed various
medications, including Norco, Xanax, and Morphine. However, there is no testimony or other
evidence of what direct effects or side effects, if any, the conditions and medications would have on
Reno's mental capacity on the day she executed the 2007 Will. 
4. McKay testified to only one instance where he had to reorient Reno. This occurred some
time after the execution of the 2007 Will. Parker testified that Reno's memory started to decline in
June, July, August, and September of 2007 (after the 2007 Will execution), where she had increasing
short-term memory problems.