

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00040-CV

_____

IN RE:  ESTATE OF EVELYN MARIE RENO, DECEASED

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2008-15,778-CCL

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

I.      **Factual and Procedural History**

Evelyn Marie Reno, a resident of Hallsville, Harrison County, Texas, died February 11, 2008, in Longview, Gregg County, Texas, at the age of eighty-one. Reno was married twice. She had three children from her first marriage, Donnie Freeman, Donald Wayne Brown, and Bonnie Tappan. Freeman and Brown are appellees herein. Appellant, Jan LeGrand, is the sole surviving child of the second marriage.

After Reno's death, a holographic will, dated December 19, 2001 ("2001 Will") and a codicil dated February 21, 2002 ("Codicil"), were admitted for probate. LeGrand sought to set aside the order probating the 2001 Will and the Codicil, and she also filed an application to probate a will dated April 20, 2007 ("2007 Will"). Freeman and Brown alleged that Reno lacked testamentary capacity to execute the 2007 Will and that the 2007 Will was the product of undue influence.[1] The trial court denied LeGrand's application to set aside the 2001 Will and Codicil and held that Reno was incompetent to execute the 2007 Will and that the 2007 Will was the product of undue influence.

---

[1]After the 2001 Will and the Codicil, Reno drafted another holographic will dated June 14, 2004 ("2004 Will") and a handwritten codicil dated March 9, 2005 ("2005 Codicil"). The provisions of the 2004 Will and 2005 Codicil are similar to those of the 2001 Will and Codicil. There is no evidence in the record that either the 2004 Will or the 2005 Codicil were submitted for probate.

LeGrand contends that there is insufficient evidence to support the trial court's findings that 1) Reno did not have the testamentary capacity to execute the 2007 Will, and 2) the 2007 Will was the product of undue influence.

We sustain LeGrand's first point of error because there is factually insufficient evidence that Reno did not have testamentary capacity at the time she executed the 2007 Will. However, we affirm the trial court's order denying LeGrand's application to probate the 2007 Will because there is sufficient evidence supporting the trial court's finding of undue influence.

## II.     Testamentary Capacity to Execute the 2007 Will

In her first point, LeGrand argues that the evidence is legally and factually insufficient to support the trial court's finding that Reno lacked testamentary capacity at the time the 2007 Will was executed. We find that the evidence supporting the judgment was factually insufficient.

### A.     Standard of Review

When reviewing a legal sufficiency challenge, we review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *In re Estate of Wilson*, 252 S.W.3d 708, 713 (Tex. App.—Texarkana 2008, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We may overrule the trial court's ruling only if the evidence conclusively establishes, as a matter of law, that Reno had capacity. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). The test is whether the evidence at trial would enable reasonable and fair-minded people to reach the

3

verdict under review. *City of Keller*, 168 S.W.3d at 827. In reviewing LeGrand's legal sufficiency challenge to the trial court's finding of lack of capacity to execute the 2007 Will, we will sustain appellants' complaint if the record reveals (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id*. at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

For a factual sufficiency challenge, we must consider and weigh all the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Dow Chem. Co.*, 46 S.W.3d at 242. In reviewing appellant's factual sufficiency challenge, we will set aside the judgment only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id*.; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

### B. Proof Required for Testamentary Capacity

LeGrand, as the proponent of the 2007 Will, has the burden of proving Reno had testamentary capacity at the time she executed the 2007 Will. *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.). "Testamentary capacity" means sufficient mental ability, at the time of execution of the will, to

4

understand the business in which the testator is engaged, the effect of his or her act in making the will, and the general nature and extent of his or her property. *In re Neville*, 67 S.W.3d 522, 524 (Tex. App.—Texarkana 2002, no pet.); *see Long*, 196 S.W.3d at 464; *In re Estate of Grimm*, 180 S.W.3d 602, 605 (Tex. App.—Eastland 2005, no pet.). The testator must be able to know his or her next of kin and the natural objects of his or her bounty, and the testator must have a sufficient memory to collect in his or her mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them. *Id.*; *In re Estate of Jernigan*, 793 S.W.2d 88, 89 (Tex. App.—Texarkana 1990, no writ).

In a will contest on the ground of testamentary incapacity, the proper inquiry is the condition of the testator's mind on the day the will was executed. *In re Estate of Trawick*, 170 S.W.3d 871, 877 (Tex. App.—Texarkana 2005, no pet.). The court's finding on the issue of testamentary capacity may be based on evidence of the testator's mental condition on the date of execution or on evidence of the testator's mental soundness before and after the date of the will's signing. *Neville*, 67 S.W.3d at 525 (citing *Croucher*, 660 S.W.2d at 55; *Carr v. Radkey*, 393 S.W.2d 806 (Tex. 1965)).

However, evidence of incompetency at other times only has probative force if that evidence demonstrates that the testator's previous or subsequent condition persists and "has some probability of being the same condition which obtained at the time of the wills [sic] making . . . ." *Trawick*, 170 S.W.3d at 876 (quoting *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968)).

5

## C.     Evidence of Testamentary Capacity

There is evidence that Reno was not always alert and was at times confused and forgetful on certain days before and after the 2007 Will was executed. In January 2007, a social service assessment history stated that Reno was "Alert as to self. Place, time and situation is off most of the time. Long-term memory appears intact, but short-term deficits and confusion and forgetfulness." Miguel Repress, the director of physical therapy at the Heritage Nursing Home where Reno resided at the time of execution of the 2007 Will, testified that Reno had "some cognitive deficits" and, at times, was "incoherent" or did not understand who he was, who she was, or what was going on. Memory Parker, a hospice LVN, visited Reno at least twice every week from September 2006 through the summer of 2007. Parker admitted there were times when Reno was "not very alert." Repress agreed with a social services' assessment that in April 2007, Reno's "mental function varies, some days appears to be lucid, others severely impaired—poor judgment and decision making ability."

But as to her condition on the day the will was executed, Repress testified Reno was coherent and was "coherent at the time of this Will signing." He testified Reno appeared to be listening to what was going on, understood she was signing a will, and was not confused at any time during the signing process.

Kathy Hayes (Hunt) was the notary public who notarized the signatures of Reno and the witnesses on the 2007 Will. Here, Hayes scanned through the will herself and read that LeGrand

would get all the property on Reno's death. Hayes did not read the will to Reno, but, with LeGrand outside the room, Hayes reviewed parts of the will with Reno and spoke with her to ensure she (Reno) knew what she was signing and what was in the will. Hayes testified that Reno knew "that [Hayes] was going to be witnessing [Reno's] signature on a Will" and "that Jan was to manage everything, you know, after [Reno] dies, manage -- be a hundred percent responsible and get any extra stuff that -- after everything is paid." Repress was present when Hayes reviewed the will with Reno. On cross-examination, Hayes admitted she was unaware that Reno suffered from confusion, anxiety, or depression, or that Reno was regularly taking pain medication.

Hayes testified that she has notarized numerous wills in the past and that if a testator is confused, cannot sign the document, or does not know what he or she is talking about when she (Hayes) explains the will to them, Hayes will refuse to notarize it and will advise the family to get a guardian appointed over the testator. In this case, throughout the will execution process, Reno never became incoherent or disoriented, and Hayes never had to redirect Reno's attention. Based on Hayes' observations and conversation with Reno, Hayes believed Reno understood the provisions of the 2007 Will.

Parker was an LVN that visited Reno through hospice. For several months before and after the execution of the 2007 Will, Parker visited Reno at least twice a week, both in her home and in the nursing home. Reno's primary health problems during this period were pain control and respiratory issues. Parker admitted there were times when Reno was "not very alert"; however, she

7

believed Reno was always aware of where she was and what was going on. Nursing home records indicated that at times, Reno refused to be turned, threw the aides out of her room, complained about the food being cold, and refused to go to physical therapy. Parker described Reno as a "very strong-willed" woman, with a mind of her own, who would not do something she did not want to do. Parker admitted that she and the hospice caregivers "babied" Reno and that Reno did not like the level of care she received from the nursing home.

Reno specifically told Parker about her final wishes, including very small details about funeral arrangements, what she wanted said, the pastor she wanted there, and the color of her earrings, ring, and dress. Parker visited Reno the day before the 2007 Will was executed, and Parker described Reno's condition as "fairly well that day." Parker testified that at that time, she knew Reno was "reviewing her Will." Another visit occurred three days after the will was executed, and Parker described Reno as "high spirited . . . very upbeat, very cheerful, one of those days when she felt she could conquer the world." From her frequent and regular contact with Reno, Parker believed Reno understood: 1) her own personal finance and business dealings; 2) what property she owned and what property she still maintained at that time; and 3) who her relatives and next of kin were.

Wayne McKay, a hospice chaplain, visited Reno at least once every week from August 2006 through the summer of 2007. In addition to praying with Reno and providing scripture and counsel, they conversed about local and world events, horses, dogs, and family. He described Reno as "very straightforward," someone who never held back what she was feeling or what she thought of

8

something, and someone who would bluntly express what she thought of someone else, including her nursing home caregivers and her family. Reno told him there was discord amongst her family members.

When asked about Reno's memory, McKay testified that Reno regularly worked crossword puzzles and was able to remember events of the past month, his prior visits, as well as those visits he missed. On the day before the execution of the 2007 Will, McKay visited Reno and did not note anything wrong with her, instead noting that it was a "good visit in prayer."[2] During the spring of 2007, he believed Reno had the ability to "know and understand her personal finances, her personal business, [and] that she could comprehend and understand what [property] she had and didn't have." McKay "never had any question about" Reno's mental capacity, and saw her as "always, I thought, very alert and sharp." He could only recall one "very rare" instance where he had to reorient Reno to the proper time or place.

### D. Analysis of the Evidence of Testamentary Capacity

Here, all the direct evidence regarding Reno's mental capacity on the day the 2007 Will was executed indicates Reno had sufficient testamentary capacity to understand and execute the 2007 Will. There is no evidence she was confused or incapacitated in any way on that day.[3] Throughout

---

[2]McKay testified that his written notation of a "good visit" meant that "everything was okay to [him.]"

[3]Testimony and Reno's medical records indicate that on or about the time she executed the 2007 Will, Reno suffered from anxiety and depression and was taking or was prescribed various medications, including Norco, Xanax, and Morphine. However, there is no testimony or other

9

the last year of Reno's life, Parker and McKay visited her several times every week, and they testified that Reno's episodes of confusion were rare and that she routinely had sufficient testamentary capacity.[4] There is evidence that Reno lacked full capacity at times before and after the 2007 Will was executed; however, there is little probative evidence that her incapacitating condition persisted on the day the 2007 Will was executed.

Based on Reno's previous days of confusion and disorientation, there may be a scintilla of evidence of her incapacity, making it legally sufficient, but the testimony of all witnesses who observed the execution of the will and Reno's condition on the day the will was signed was that she had the requisite testamentary capacity to execute the will on the date she signed it. Therefore, the finding that Reno lacked testamentary capacity is so against the great weight of the evidence as to be clearly wrong and unjust. The evidence supporting the finding is factually insufficient, and we sustain LeGrand's first point of error.

---

evidence of what direct effects or side effects, if any, the conditions and medications would have on Reno's mental capacity on the day she executed the 2007 Will.

[4]McKay testified to only one instance where he had to reorient Reno. This occurred some time after the execution of the 2007 Will. Parker testified that Reno's memory started to decline in June, July, August, and September of 2007 (after the 2007 Will execution), where she had increasing short-term memory problems.

**III.    Undue Influence**

In her second point of error, LeGrand contends the evidence is legally and factually insufficient to support the trial court's finding that the 2007 Will was the product of undue influence. We disagree.

To justify setting aside a will because of undue influence, a contestant must prove (1) the existence and exertion of an influence (2) that subverted or overpowered the mind of the testator at the time of execution of the instrument (3) so that the testator executed an instrument he or she would not otherwise have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *In re Estate of Steed*, 152 S.W.3d 797, 807 (Tex. App.—Texarkana 2004, pet. denied); *Mackie v. McKenzie*, 900 S.W.2d 445, 449–50 (Tex. App.—Texarkana 1995, writ denied). We must begin with the proposition that a person of sound mind has a perfect right to dispose of his or her property as he or she wishes. *Rothermel*, 369 S.W.2d at 923. Therefore, the burden of proving undue influence is on the party contesting its execution. *Id.* at 922. To succeed, the party claiming undue influence must introduce some tangible and satisfactory proof of the existence of each of the above stated elements of undue influence. *Scott v. Townsend*, 106 Tex. 322, 166 S.W. 1138 (1914).

The *Rothermel* decision establishes that the general topics examined to prove an influence was undue are: the relationship existing between the testator and the parties, the opportunities for

an exertion or deception, the circumstances surrounding the drafting and execution of the will, the existence of a fraudulent motive, and any domination of the testator by another.

To prove whether the testator's free will was subverted or overcome, we examine the testator's mental or physical incapacity to resist or susceptibility to influence. Weakness of mind or body are relevant inquiries.

Finally, in inquiring if the will would not have been executed but for such influence, we review whether the will as executed was unnatural in its disposition of property. *Rothermel*, 369 S.W.2d at 923.

One may request, importune, or entreat another to create a favorable dispositive instrument, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument. *Id.* at 922.

Other topics usually examined are the motive, character, and conduct of the person benefitting from the will, the words, and acts of the parties. *Mackie*, 900 S.W.2d at 449; *Green v. Earnest*, 840 S.W.2d 119, 122 (Tex. App.—El Paso 1992, writ denied).

Because the exertion of undue influence is usually subtle, and by its very nature usually involves an extended course of dealings, contacts, and circumstances, undue influence may be proven by direct and circumstantial evidence. *Rothermel*, 369 S.W.2d at 922. In the absence of direct evidence, we should consider all of the circumstances shown or established by the evidence. *Id.* Even though none of the circumstances standing alone would be sufficient to satisfy the elements

of undue influence, if when considered together the circumstances produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion. *Barksdale v. Dobbins*, 141 S.W.2d 1035 (Tex. Civ. App. 1940, writ ref'd). A solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside on a bare suspicion of wrongdoing. *Rothermel*, 369 S.W.2d at 922–23; *Burgess v. Sylvester*, 143 Tex. 25, 182 S.W.2d 358 (1944). Therefore, the circumstances relied on as establishing the elements of undue influence must be "of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *Rothermel*, 369 S.W.2d 922; *Stewart v. Miller*, 271 S.W. 311 (Tex. Civ. App.—Waco 1925, writ ref'd).

### A. The Existence and Exertion of an Influence

#### 1. The nature of the relationship of Reno and her children.

Reno's relationship with Freeman and Tappan was strained. In July 2006, Freeman and Tappan filed a guardianship action seeking to have a guardian appointed over Reno. Reno was so upset on receiving notice of the guardianship action that she "called the police on" Tappan and remained upset about it well into the fall of 2006, even after the guardianship action was dropped.

Before Reno's placement in the nursing home, Reno lived within walking distance of Tappan, but Reno had repeatedly accused Tappan and her children of stealing from her. In response

13

to the accusations, in a letter dated October 3, 2006, Tappan made clear that neither she nor her children would "set foot on [Reno's] property again" and threatened to file harassment charges against Reno if the accusations did not cease. Despite having visited Reno frequently before the incident, Tappan did not see Reno again after mailing the October letter.

There was also long-standing conflict between the children of Reno's first marriage, Brown, Freeman, and Tappan, and the child of Reno's second marriage, LeGrand. Reno was very concerned about the conflict among and between her children. That animosity concerned Reno to the point she told McKay about the conflict and even noted it in her 2001 Will. Reno never indicated she wanted to further separate the children. Therefore, there is evidence of conflict between LeGrand and the children of Reno's first marriage as well as evidence that Reno was upset with Freeman and Tappan. This factor shows no exertion of undue influence.

### 2. The opportunity to exert undue influence.

From October 2006 until Reno's death in February 2008, LeGrand was Reno's primary visitor, support, and nonprofessional caregiver. LeGrand exercised a great deal of control over the healthcare that Reno received, even choosing Reno's nursing home. Until October 2006, before entering the nursing home, LeGrand and her half-sister, Tappan, ensured Reno's bills were paid by writing checks on Reno's account and having Reno sign them. After October 2006, LeGrand wrote the checks for Reno to sign. LeGrand acknowledges she was the only party in this case that had any contact with Reno from October 2006 until Reno's death in February 2008; she did not tell Freeman

14

or Tappan of Reno's location during that time and requested the staff not to reveal information about her mother. LeGrand testified this was done at her mother's request. For whatever reason, LeGrand had exclusive access to Reno for several months and, therefore, an unlimited opportunity to exert influence on Reno.

### 3. The circumstances of preparation and execution of the 2007 Will.

LeGrand testified that Reno wanted to "make a will" and "to leave everything to [her]." Reno handwrote her two previous wills and their codicils, but LeGrand drafted the 2007 Will, which leaves everything to her, and arranged for its execution at the nursing home. Multiple witnesses attested that Reno was "mentally competent and under no constraint or undue influence." With LeGrand out of the room, Hayes discussed the 2007 Will with Reno and presided over its execution. LeGrand cites our decision in *Steed*, 152 S.W.3d at 809, for her argument that "even the existence of some controlling influence by [her] over [Reno] is not sufficient to invalidate the 2007 will unless the influence was specifically exerted on the testamentary act." In *Steed*, there was some evidence that the testator personally drafted a holographic will in order to pacify his wife, who was accused of undue influence. *Id.* at 807–08, 811. All the evidence indicated that the testator drafted the will "alone," while his wife was in a different city. *Id.* at 809. Here, LeGrand wrote the will and had constant contact with the testator, Reno. The facts that LeGrand prepared the 2007 Will and that she had constant contact with Reno at the time the 2007 Will was prepared and executed markedly differ from the facts present in *Steed*, and, therefore, *Steed* is distinguishable.

15

While LeGrand did not physically cause Reno to sign the will, she did personally prepare the will for Reno. A will may not be executed until someone prepares it; one element of the consummation of a will is the physical preparation of the will that is signed by the testator. Testimony of the "making of the testament itself" may provide evidence of exertion of an undue influence. *Rothermel*, 369 S.W.2d at 923.

While the physical execution of the will shows no undue influence, the fact that LeGrand personally prepared the will without the intervention of an attorney or other third party is significant. *Boyer v. Pool*, 154 Tex. 586, 280 S.W.2d 564, 566 (1955) ("Proof of the planning and preparation of the will, where the witnesses are available, is the heart of an undue influence case."). This important fact is extremely persuasive in finding the exertion of influence by LeGrand.

**4.      Reno's dependency on LeGrand.**

Reno was in declining mental and physical health for more than the last two years of her life. Before Reno entered the nursing home, LeGrand was her primary visitor and nonprofessional caregiver. Tappan and LeGrand often wrote checks on Reno's account in order to get Reno's bills paid. When LeGrand placed Reno into the nursing home, she did not notify any other family members, and directed the nursing home not to release any information about Reno being a resident there. Reno's best friend and half-sister both visited Reno in the nursing home, and LeGrand instructed both of them to keep her location a secret. LeGrand testified that withholding information

16

about Reno's whereabouts was Reno's decision. This factor weighs in favor of the finding of undue influence.

When taken together, these facts support the finding of an existence and exertion of an influence by LeGrand over Reno. The proof must also show that the influence operated to subvert or overpower the testator's mind.

### B.    Subvert or Overpower Reno's Mind—Susceptibility to Influence

An important factor in determining if the testator's will was overcome is the testator's mental and physical condition and the susceptibility of the testator to an undue influence. *Rothermel*, 369 S.W.2d at 923. At the time the 2007 Will was executed, Reno was in a somewhat weakened physical and mental condition—she was eighty years old, resided in a nursing home, under hospice care, and suffered from occasional episodes of mental disorientation and confusion. However, as previously noted in this opinion, the direct evidence from the notary and witnesses present on the day the 2007 Will was executed uniformly indicate that Reno had sufficient testamentary capacity.

LeGrand testified that most of the time Reno "was right there with you" mentally, but in the fall of 2006, when she asked Reno about making a will, Reno would mentally "shut down" for a couple of days. In contrast, LeGrand, McKay, and Parker all testified that Reno was very straightforward and was always able to tell you what she wanted and had sufficient capacity to understand and execute the 2007 Will.

While we have held that the evidence does not support a finding that Reno lacked the testamentary capacity to execute the will, the facts demonstrate that she was in a weakened condition, subject to hospice care, and at times was not fully cognizant of all events. We find this evidence is some circumstantial evidence of a susceptibility to an undue influence.

### C.      Execution of a Will She Would Not Otherwise Have Executed

The most important factor in determining if the will was one the testator otherwise would not have executed is the unnatural disposition. *Id.* Here, the 2001 Will, the 2002 Codicil, the 2004 Will, and the 2005 Codicil made numerous specific bequests and devises to each of Reno's four children, each of her thirteen grandchildren, as well as hospitals, a church, and pastor. However, the 2007 Will effectively leaves all of Reno's property to LeGrand. A person of sound mind has a perfect legal right to dispose of his or her property as he or she wishes, and the 2007 Will makes a disposition of the property where one child is preferred over the other children and grandchildren. But where a reasonable explanation for such unnatural disposition is present, an unnatural disposition is understandable. *McKenzie*, 900 S.W.2d at 450 (citing *Rothermel*, 369 S.W.2d at 924). Here, there is evidence that one daughter had severed all ties with Reno and that Reno was upset at the attempt to obtain a guardianship. While one may decide to change his or her will without undue influence, the fact is that LeGrand prepared this self-serving will. While we do not find that the disposition of Reno's property by this will is unnatural, in light of the animosity with some family members, it is completely different from previous wills in the sense that certain other family

18

members and charities to whom she had previously devised property were completely omitted. This factor alone does not show an undue influence, but is only one of the many facts that combine to allow the trial court to reach such a conclusion. *See Cobb v. Justice*, 954 S.W.2d 162, 166 (Tex. App.—Waco 1997, pet. denied).

When viewed in light of the applicable law, the evidence supporting the trial court's finding of undue influence is more than a scintilla and such finding is not against the great weight of the evidence in this case. Therefore, there is legally and factually sufficient evidence to support the trial court's finding of undue influence.

Since we uphold the trial court's conclusion that the 2007 Will was produced as a result of an undue influence, we affirm the judgment of the trial court.

Jack Carter
Justice

Date Submitted:     November 3, 2009
Date Decided:       December 18, 2009

19