

**NUMBER 13-15-00066-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**IN RE FRED ADKINS**

**On Petition for Writ of Mandamus.**

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Longoria**
**Memorandum Opinion by Justice Longoria[1]**

Relator, Fred Adkins, filed a petition for writ of mandamus in the above cause on February 9, 2015, seeking to compel the trial court to withdraw its order granting a new trial and enter judgment in Adkins's favor.[2]  Adkins contends, in short, that the jury's

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so.  When granting relief, the court must hand down an opinion as in any other case."); TEX. R. APP. P. 47.4 (distinguishing opinions and memorandum opinions).

[2] This original proceeding arises from trial court cause number P-34,953 filed in the County Court at Law No. 3 of Hidalgo County, Texas.  The respondent in this original proceeding is the Honorable John A. Hutchison III, a statutory probate judge presiding by appointment.

verdict in his favor was supported by factually sufficient evidence, and the trial court impermissibly substituted its judgment for that of the jury in granting a new trial. After performing a merits-based review of the trial court's order in accordance with *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 755–59 (Tex. 2013) (orig. proceeding), we deny the petition for writ of mandamus.

## I. BACKGROUND

The underlying matter is a will contest regarding the issues of testamentary capacity and undue influence. Everett Hank Tingle passed away at the age of eighty-seven on February 5, 2012. His death certificate indicates he died as a result of respiratory failure, sepsis, atrial fibrillation, and hypotension. His caregiver and former son-in-law, Adkins, sought to probate a will executed by Tingle on March 20, 2006, which essentially left Tingle's property to Adkins. In contrast, Antonia Tingle, Tingle's ex-wife and Adkins' former mother-in-law, sought to probate a will executed by Tingle on December 13, 2010, leaving his property to her. Tingle, a frugal man, left a substantial estate.

After a four-day jury trial, the jury rendered a verdict finding that: (1) Tingle did not have testamentary capacity to sign the will dated December 13, 2010; (2) Tingle signed the will dated December 13, 2010 as a result of undue influence; (3) Antonia did not prosecute the proceeding to probate the December 13, 2010 will in good faith and with just cause; and (4) Antonia incurred $65,000 for "necessary expenses and disbursements," including attorney's fees, incurred in prosecuting the proceeding to probate the will. On December 30, 2013, the trial court entered a final judgment in favor of Adkins in accordance with the jury's verdict denying Antonia's application to probate

2

the December 13, 2010 will, rendering judgment in favor of Adkins, and denying Antonia any award for the expenses and attorney's fees she incurred in attempting to probate the 2010 will.

On January 22, 2014, Antonia filed a motion for judgment notwithstanding the verdict, or alternatively, motion for new trial. According to Antonia's motion, the "jury reached a decision based . . . more on its subjective view of justice, as opposed to the underlying facts." On February 20, 2014, Adkins filed a response to Antonia's motion for new trial. On February 25, 2014, the trial court held a non-evidentiary hearing on Antonia's motion and set the motion for submission on March 13, 2014. On March 13, 2014, the trial court granted Antonia's motion for a new trial. The trial court's order granting Antonia's motion for new trial provides as follows:

> On March 13, 2014, the Court considered the Motion for a New Trial filed by Antonia Tingle, the response thereto, and the evidence adduced at the hearing,[3] and enters the following findings:
>
> 1.    As to jury issue No. 1 regarding testamentary capacity, the jury's verdict is against the great weight and preponderance of the credible evidence. The evidence from the witnesses showed overwhelmingly that Everett Hank Tingle possessed testamentary capacity at the time of the execution of the will dated December 13, 2010.
>
> 2.    As to jury issue No. 2 regarding undue influence, the jury's verdict is against the great weight and preponderance of the credible evidence. There was insufficient evidence to show that Everett Hank Tingle signed the will dated December 13, 2010, as the result of undue influence. The evidence only indicated mere speculation or a bare suspicion that undue influence had been exercised.
>
> 3.    As to jury issue No. 3, regarding good faith of proponent Antonia Tingle, the jury's verdict is against the great weight and preponderance of the credible evidence. There was no evidence presented to show that Antonia Tingle did not prosecute the probate of the will in good faith.

---

[3] As previously noted, contrary to the recital in the order granting new trial, there was no evidence adduced at the hearing on the motion for new trial.

4. As to jury issue No. 4, if jury issue No.4 derives from Jury Issue No.3, if jury issue No. 3 is against the great weight and preponderance of evidence, then the answer to Jury Issue No. 4 is manifestly unjust.

IT IS ORDERED THAT Plaintiff's Motion for a New Trial is GRANTED based on the findings herein and in the interest of justice.

Adkins sought review of the order granting a new trial by petition for writ of mandamus filed in this Court. *See In re Adkins*, No. 13-14-00484-CV, 2014 WL 5026051, at **1–6 (Tex. App.—Corpus Christi Oct. 8, 2014, orig. proceeding) (mem. op.). We held that, while the order granting the new trial was supported by legally appropriate reasons and included some analysis regarding the sufficiency of the evidence, the order was insufficiently specific to meet the rigorous and detailed standards articulated by the Texas Supreme Court. *See id.* at *1 (citing *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding); *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 212 (Tex. 2009) (orig. proceeding)).

Subsequently, the trial court issued an amended order granting a new trial on November 7, 2014. The amended order states in relevant part:

On March 27, 2012, Antonia Gutierrez Tingle ("Antonia") filed her application to probate the Last Will and Testament of her ex-husband, Everett "Hank" Tingle, dated December 13, 2010. Fred Adkins ("Adkins"), a former caregiver to Everett Tingle filed a competing application for the probate of a copy of a previous will dated March 20, 2006, the original of which was never produced. Adkins contended that Mr. Tingle did not possess mental capacity to execute the 2010 will and/or that Mr. Tingle was unduly influenced to make the 2010 will.

. . . .

Pursuant to the Court of Appeals' opinion, the Court hereby amends its order granting a new trial to state that a new trial is ordered for the following reasons:

4

JURY ISSUE NO. 1: TESTAMENTARY CAPACITY.

In Issue Number 1, the jury was asked if Everett Tingle had testamentary capacity when he signed the December 13, 2010, will, to which the jury answered: "No." As that will had not been admitted to probate, and in accordance with Texas law, the burden of proof to obtain an affirmative finding under Issue No. 1 was on the proponent of that will, Antonia Gutierrez Tingle. When a party seeks a new trial by challenging the factual sufficiency of the evidence regarding an adverse finding on an issue on which he has the burden of proof, he/she must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. The Court must consider and weigh all of the evidence and can set aside a verdict only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. In determining whether a finding is against the great weight and preponderance of the evidence, the court must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as the evidence that tends to disprove its existence.

Applying the foregoing standard of review, this Court finds that the jury's negative answer to Issue No. 1, that is, the jury's failure to find that Everett Tingle had testamentary capacity when he signed the December 13, 2010, will was against the great weight and preponderance of the evidence, and therefore must be set aside.

The evidence from the witnesses showed overwhelmingly that Everett "Hank" Tingle possessed testamentary capacity at the time of the execution of the will dated December 13, 2010. The testimony of witnesses revealed that on December 13, 2010, Mr. Tingle drove himself to Falcon National Bank located in McAllen, Texas, for the sole purpose of executing a new will, and revoking all prior wills. Mr. Tingle, a customer of Falcon National Bank since 2006, requested that Leticia Echazarreta, the Branch President, prepare his new will. Mrs. Echazarreta had handled all of Mr. Tingle's financial affairs for the four years preceding the execution of his 2010 will. Mr. Tingle had previously telephoned Mrs. Echazarreta to schedule an appointment for the preparation of his will. Mrs. Echazarreta informed Mr. Tingle she could not prepare his will, but could notarize whatever document he needed. Mr. Tingle then went to the bank requesting to speak with Mrs. Echazarreta.

The two exchanged conversation, and Mr. Tingle ultimately persuaded Mrs. Echazarreta to draft his will. Mrs. Echazarreta prepared the will and requested Esmer Medina, her co-worker, to be present to witness Mr. Tingle['s] signing of the will. During the course of the trial, the Court heard from the two witnesses to the 2010 will. Both witnesses testified that Mr. Tingle did not appear to be suffering from any mental

impairment and that he understood that he was executing a new will. Both Mrs. Echazarreta and Ms. Ester Medina recounted knowing a smart, business savvy individual able to remember exactly how much money was in his bank account at any given moment. During the course of the trial, this Court ruled that February 3, 2010, was not relevant in determining Tingle's mental capacity as Dr. George had testified, because the relevant time to determine testamentary capacity was the time of the execution of the will. Adkins claimed that Mr. Tingle was incapacitated on February 3, 2010, yet he regained his mental capacity on July 7, 2010, just in time to sign an affidavit of non-prosecution relieving Relator of any criminal liabilities for the theft of Mr. Tingle's property.

This Court finds that the evidence from the witnesses showed overwhelmingly that Everett "Hank" Tingle possessed testamentary capacity at the time of the execution of the will dated December 13, 2010, and, therefore, that the jury's answer to Issue No. 1 was against the great weight and preponderance of all the evidence.

JURY ISSUE NO. 2[:] "UNDUE INFLUENCE.

In Issue Number 2, the jury was asked if Everett Tingle signed the December 13, 2010, will as a result of undue influence, to which the jury answered "Yes." As submitted, the burden of proof to obtain an affirmative finding on that issue was on Adkins.

When a party seeks a new trial by challenging the factual sufficiency of [an] adverse finding on an issue on which the opposing party had the burden of proof, the court must review the factual sufficiency of the evidence by weighing and considering the evidence both in support of, and contrary to the challenged finding. The Court will set aside the finding only if the evidence is so factually weak, or the verdict so contrary to the overwhelming weight of the evidence as to make the judgment clearly wrong and manifestly unjust.

Applying this standard of review, the court finds that the jury's answer to Issue No. 2, that is, that Everett Tingle signed the December 10, 2010 will as the result of undue influence, is not supported by factually sufficient evidence and, therefore, must be set aside.

As Adkins had the burden of proving that Mr. Tingle was unduly influenced at the time he executed the December 13, 2010, will, Adkins was required to prove the existence and exertion of undue influence, which effectively operated to subvert or overpower the mind of Tingle *at time of the execution of the will* and that Tingle would not have executed the will but for such influence. The establishment of circumstances that Antonia had an opportunity to exert such influence merely because she cared for

6

Mr. Tingle does not give rise to any inference that she *did* exert undue influence. A finding of undue influence cannot be based solely on evidence, direct or circumstantial, to show that influence merely was possible. There must also be evidence that undue influence was in fact exerted with respect to the making of the will.

Both Mrs. Echazarreta and Mrs. Esmer Medina, witnesses to Tingle's will, testified that Tingle drove himself to the bank on December 13, 2010. Adkins claims a piece of paper held by Mr. Tingle on that day unduly influenced him to make a will in favor of Antonia. That piece of paper was never produced. Moreover, Adkins was asked what led him to believe that Antonia had unduly influenced Tingle. He said, "I can't think of anything right now."

In determining whether undue influence was a factor in the execution of a will, an analysis into susceptibility of the testator's mind is important. The Court finds that neither the close proximity of Antonia's apartment to Mr. Tingle's apartment nor the piece of paper held by Mr. Tingle while dictating his will are sufficient evidence to prove Antonia[] unduly influenced Mr. Tingle to prepare a will in her favor. Further, neither of these incidents rises to the level of influence that courts have relied on to determine undue influence. There was insufficient evidence to show that Everett Hank Tingle signed the will dated December 13, 2010, as the result of undue influence. The evidence only indicated mere speculation or a bare suspicion that undue influence had been exercised. Therefore, the Court finds that the jury's answer to Issue No.2 is not supported by factually sufficient evidence.

JURY ISSUE NO. 3:  GOOD FAITH.

In Issue No.3 the jury was asked if Antonia had exercised good faith in the prosecution of the probate of her will, to which the jury answered "No." As explained above, the Court has found that the jury's finding of lack of testamentary capacity was against the great weight and preponderance of the evidence and that the jury's finding of undue influence was not supported by factually sufficient evidence. The Court also notes that there was no evidence presented to show that Antonia did not prosecute the probate of the will in good faith. The Court finds that despite divorcing in 2002, Mr. Tingle and Antonia remained close friends until the date of his death. The evidence adduced at trial revealed that on many occasion[s], they would sit outside listening to music as the sun set on the horizon. In 2006, Mr. Tingle expressed his desire to include Mrs. Tingle and Fred Adkins, as beneficiaries of his will. However, Mrs. Tingle declined to be included in his will. The evidence showed when Tingle learned that Adkins had stolen from him, he acted to create the December 3, 2010 will. There is no evidence to show that Antonia Gutierrez Tingle did not prosecute the probate of the will in good faith. Therefore, the Court finds that the jury's

answer to Issue Number 3 is against the great weight and preponderance of the evidence or, alternatively, is not supported by factually sufficient evidence.

JURY ISSUE NO. 4:  ATTORNEYS FEES.

As the evidence of the reasonable amount of attorney's fees will change because of the time involved with the mandamus petition and retrial, the jury's findings under Issue Number 4 will be set aside and resubmitted to the jury upon retrial.

IT THEREFORE ORDERED THAT Plaintiffs Motion for a New Trial is GRANTED based on the findings herein.

(Internal citations omitted).

This original proceeding ensued.  By three issues, Adkins contends that the trial court abused its discretion by:  (1) setting aside a jury verdict and ordering a new trial because the jury's findings were reasonable and supported by evidence at trial; (2) rendering a new trial order which recites facts and testimony considered by the jury but disregarded by the court as a basis for granting a new trial; and (3) substituting its judgment for that of the jury when the new trial order omits evidence considered by the jury which was reasonable and supported the jury's verdict.  The Court requested and received a response to the petition for writ of mandamus from Antonia.

## II. MANDAMUS

Mandamus is appropriate when the relator demonstrates that the trial court clearly abused its discretion and the relator has no adequate remedy by appeal.  *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding).  The relator has the burden of establishing both prerequisites to mandamus relief, and this burden is a heavy one.  *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (orig. proceeding).

8

A trial court clearly abuses its discretion if it reaches a decision that is so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). Because this balance depends heavily on circumstances, it must be guided by the analysis of principles rather than the application of simple rules that treat cases as categories. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding). We evaluate the benefits and detriments of mandamus review and consider whether mandamus will preserve important substantive and procedural rights from impairment or loss. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136.

### III. NEW TRIAL ORDERS

"[T]he long-established precedents in this state demonstrate respect for jury verdicts." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988); *see In re E.I. du Pont de Nemours & Co.*, No. 09-14-00465-CV, ___ S.W.3d ____, 2015 WL 1849708, at *2 (Tex. App.—Beaumont Apr. 23, 2015, orig. proceeding). In a jury trial, the jury is the fact finder and sole judge of the credibility of the witnesses and of the weight to be given to their testimony and a reviewing court "must not merely substitute its judgment for that of the jury." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Nevertheless, Rule 320 of the Texas Rules of Civil Procedure gives the trial court broad discretion to grant a new trial "for good cause, on motion or on the court's own motion." TEX. R. CIV. P. 320. The Texas Supreme Court has held that although trial courts

9

have significant discretion in granting new trials, "such discretion should not, and does not, permit a trial judge to substitute his or her own views for that of the jury without a valid basis." *In re Columbia Med. Ctr.*, 290 S.W.3d at 212. Accordingly, a trial court's order granting a motion for new trial must provide a reasonably specific explanation of the court's reasons for setting aside a jury verdict. *Id.* at 213; *see, e.g., In re Hunter*, 306 S.W.3d 422, 423 (Tex. App.—Dallas 2010, orig. proceeding); *In re C.R.S.*, 310 S.W.3d 897, 898 (Tex. App.—San Antonio 2010, orig. proceeding); *In re Carrizo Oil & Gas Co.*, 292 S.W.3d 763, 764 (Tex. App.—Beaumont 2009, orig. proceeding); *see also In re Davis*, No. 02-14-00131-CV, 2014 WL 2145433, at *1 (Tex. App.—Fort Worth May 20, 2014, orig. proceeding) (mem. op.); *In re Whaley*, No. 05-12-01518-CV, 2012 WL 5991789, at *1 (Tex. App.—Dallas Nov. 30, 2012, orig. proceeding) (mem. op.).

A trial court does not abuse its discretion so long as its stated reason for granting a new trial is: (1) a reason for which a new trial is legally appropriate, such as a well-defined legal standard or a defect that probably resulted in an improper verdict; and (2) specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand. *See In re United Scaffolding, Inc.*, 377 S.W.3d at 688–89. A new trial order may be an abuse of discretion if, for example, it is based on a reason that is not legally valid, or "if the articulated reasons plainly state that the trial court merely substituted its own judgment for the jury's." *Id.* at 689.

Further, an appellate court may conduct a merits-based mandamus review of a trial court's articulated reasons for granting a new trial. *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d at 755–59; *see In re Whataburger Rests. LP*, 429 S.W.3d 597, 598 (Tex.

2014) (orig. proceeding) (per curiam); *In re Health Care Unlimited, Inc.*, 429 S.W.3d 600, 602 (Tex. 2014) (orig. proceeding) (per curiam).  If the articulated reasons are not supported by the law and the record, mandamus relief is appropriate.  *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d at 761–62.

Our mandamus review must be mindful of the different roles of the jury, the trial court, and the appellate court.  *See In re E.I. du Pont de Nemours & Co.*, 2015 WL 1849708, at *2.  We may not substitute our judgment for that of the trial court, and the trial court may not substitute its judgment for that of the jury in granting a new trial.  *See id.; In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 152 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. filed]).  We determine whether the trial court has abused its discretion by substituting its judgment for that of the jury by confirming whether the court's reasons for granting a new trial are valid and correct, i.e., supported by the trial record.  *In re Wyatt Field Serv. Co.*, 454 S.W.3d at 152.

## IV. ANALYSIS

As stated previously, Adkins contends in three issues, which we address as one, that the trial court abused its discretion by substituting "its own judgment for that of the jury."  As a preliminary matter, we determine that the trial court's amended order meets the threshold requirements established by the Texas Supreme Court for orders granting new trials.  *See In re United Scaffolding, Inc.*, 377 S.W.3d at 688–89.  The trial court's order recites that the verdict was against the great weight and preponderance of the evidence or was supported by factually insufficient evidence, which are legally sound reasons to grant a new trial.  *See id.*; *see also, e.g., Sanders v. Harder*, 227 S.W.2d 206, 209–10 (Tex. 1950) ("In ordinary civil cases trial courts . . . may set aside jury verdicts

11

and grant new trials when, in their opinion, those findings, though based upon some evidence, are against the great weight and preponderance of the evidence."). Moreover, the trial court's order elaborates, with specific reference to the evidence adduced at trial, how the jury's answers are contrary to the great weight and preponderance of the evidence. *See In re United Scaffolding, Inc.*, 377 S.W.3d at 688–89; *In re Columbia Med. Ctr.*, 290 S.W.3d at 212. Accordingly, we must determine whether the trial court's stated reasons for granting a new trial are valid and correct by conducting a careful "merits review" of the record. *See In re Toyota Motor Sales*, 407 S.W.3d at 759 ("Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough; the reasons must be valid and correct.").

The specific issues in this case involve the factual sufficiency of the jury's findings regarding whether Tingle had testamentary capacity to execute the December will, whether he executed that will as a result of undue influence, and whether Antonia offered that will to probate in good faith. We begin by examining the law underlying these concepts.

**A. Applicable Law**

The trial court's new trial order relies on the factual sufficiency of the evidence. When reviewing a challenge to the factual sufficiency of the evidence, we consider all of the evidence in the record, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Lofton v. Tex. Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986) (per curiam). Factual sufficiency issues concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the jury's finding erroneous. *Raw Hide Oil & Gas, Inc. v. Maxus*

12

*Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied). If an appellate court concludes that the evidence is factually insufficient, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). Factual sufficiency issues are designated as insufficient evidence points or great weight and preponderance points depending upon whether the complaining party had the burden of proof. *Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 275.

When a party with the burden of proof complains that an adverse finding is factually insufficient, the party must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We can set aside a verdict after considering and weighing all of the evidence "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*; *Pool*, 714 S.W.2d at 635. We may conclude that a finding is against the great weight and preponderance of the evidence even if the record contains some evidence to support the finding. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

The insufficient evidence standard is used to evaluate the evidence supporting an issue on which the appellant did not have the burden of proof at trial. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.). We examine all of the evidence in the record to determine if the evidence supporting the finding is so contrary to the overwhelming weight of the evidence that the finding should be set aside. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

13

In the instant case, the jury concluded that Tingle lacked the mental capacity to execute the December 13, 2010 will; however, the trial court concluded otherwise. A testator must be of sound mind to have the right and power to make a last will and testament. TEX. ESTATES CODE ANN. § 251.001 (West, Westlaw through 2015 R.S.). This means that the testator must have testamentary capacity at the time the will is executed. *In re Neville*, 67 S.W.3d 522, 524 (Tex. App.—Texarkana 2002, no pet.). The proponent of the will bears the burden of establishing that it was properly executed and that the testator had testamentary capacity. *Croucher*, 660 S.W.2d at 57; *In the Estate of Coleman*, 360 S.W.3d 606, 610 (Tex. App.—El Paso 2011, no pet.). Testamentary capacity means that a party must have sufficient mental ability to: (1) understand the business in which he is engaged; (2) understand the effect of the act in making a will; (3) understand the general nature and extent of his property; (4) know his next of kin and the natural objects of his bounty and the claims upon him; and (5) collect in his mind the elements of the business to be transacted and hold them long enough to perceive their obvious relation to each other and to form a reasonable judgment about them. *In re Estate of Lynch*, 350 S.W.3d 130, 136 (Tex. App.—San Antonio 2011, pet. denied); *see Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.); *In re Estate of Blakes*, 104 S.W.3d 333, 336 (Tex. App.—Dallas 2003, no pet.); *In re Neville*, 67 S.W.3d at 524; *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.).

In determining whether a testator had testamentary capacity, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968); *Long*, 196 S.W.3d at 464–65. Where there is no

direct testimony in the record of acts, demeanor, or a condition indicating that the testator lacked testamentary capacity on the day the will was executed, the testator's mental condition on that date may be determined from lay opinion testimony based upon the witnesses' observations of the testator's conduct either prior to or subsequent to the execution of the will. *See Lee*, 424 S.W.2d at 611; *see also Schindler v. Schindler*, 119 S.W.3d 923, 931 (Tex. App.—Dallas 2003, pet. denied). However, evidence of the testator's state of mind at other times has probative force only if it demonstrates that a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed. *Croucher*, 660 S.W.2d at 57; *Lee*, 424 S.W.2d at 611; *Long*, 196 S.W.3d at 464–65. The burden of proving testamentary capacity is on the proponent of the will. *Croucher*, 660 S.W.2d at 57; *Siegler v. Siegler*, 391 S.W.2d 403, 404 (Tex. 1965) (per curiam). Here, the proponent of the will is Antonia.

The jury in this case concluded that Tingle signed the December 13, 2010 will as a result of undue influence; however, the trial court concluded otherwise. To establish a claim of undue influence, a contestant must prove the following: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the person's mind when executing the document; and (3) the person would not have executed the document but for the influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *In re Estate of Johnson*, 340 S.W.3d 769, 776 (Tex. App.—San Antonio 2011, pet. dism'd); *Cobb v. Justice*, 954 S.W.2d 162, 165 (Tex. App.—Waco 1997, pet. denied). There must be some tangible and satisfactory proof of the existence of each of the three elements. *In re Estate of Johnson*, 340 S.W.3d at 776; *see Rothermel*, 369 S.W.2d at 922.

15

The contestant must prove the elements of undue influence by a preponderance of the evidence. *Cobb*, 954 S.W.2d at 165; *Evans v. May*, 923 S.W.2d 712, 715 (Tex. App.—Houston [1st Dist.] 1996, writ denied). Importantly, not every influence exerted by one person on the will of another is undue, *Rothermel*, 369 S.W.2d at 922, and its exertion "cannot be inferred by opportunity alone." *See Cotton v. Cotton*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied). An influence is not "undue" unless the free agency of the testator is destroyed and a testament is produced that expresses the will of the one exerting the influence rather than the one executing the will. *Long v. Long*, 125 S.W.2d 1034, 1035–36 (Tex. 1939). Thus, a will contestant must not only provide evidence that an undue influence existed, they must also offer evidence of the testator's state of mind at the time the will was executed that would tend to show his free agency was overcome by such influence. *See Rothermel*, 369 S.W.2d at 922.

Undue influence may be shown by direct or circumstantial evidence but will usually be established by the latter. *Estate of Davis v. Cook*, 9 S.W.3d 288, 293 (Tex. App.—San Antonio 1999, no pet.). When circumstantial evidence is relied upon, the circumstances must be so strong and convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but also that it controlled the willpower of the testator at the precise time the will was executed. *Id.* "Circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *Id.*

Factors to be considered in determining the existence of undue influence include: (1) the nature and type of relationship existing between the testator, the contestants, and

the party accused of exerting such influence; (2) the opportunities existing for the exertion of the type or deception possessed or employed; (3) the circumstances surrounding the drafting and execution of the testament; (4) the existence of a fraudulent motive; (5) whether there has been a habitual subjection of the testator to the control of another; (6) the state of the testator's mind at the time of the execution of the testament; (7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted; (8) words and acts of the testator; (9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise; and (10) whether the testament executed is unnatural in its terms of disposition of property. *In re Estate of Graham*, 69 S.W.3d 598, 609–10 (Tex. App.– Corpus Christi 2001, no pet.); *see Rothermel*, 369 S.W.2d at 922. The burden of proving undue influence is on the party contesting the probate of the will. *Long*, 125 S.W.2d at 1036. In this case, Adkins had the burden of proving that the will was procured by undue influence.

A finding that an executor procured a will by undue influence does not preclude a finding that the executor, nevertheless, offered the will in good faith and with just cause. *Harkins v. Crews*, 907 S.W.2d 51, 62 (Tex. App.—San Antonio 1995, writ denied) (citing *Huff v. Huff*, 124 S.W.2d 327, 330 (Tex. 1939)). Good faith is a question of fact, to be determined under all the circumstances of the case. *Id.* Good faith and just cause is a separate jury question, and it is not determined automatically by a finding of, or no finding of, undue influence. *See id.*

Expert medical testimony is not required to prove that a person lacks testamentary capacity or to prove an undue influence claim because "the requisite proof regarding

17

mental capacity is within the common knowledge and experience of laypersons." *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *see Estate of Riggins*, 937 S.W.2d 11, 19 (Tex. App.—Amarillo 1996, writ denied).  Testimony about mental competency or ability is an expression of opinion whether it is from an expert or a layman, and opinion testimony does not establish any material fact as a matter of law. *Estate of Riggins*, 937 S.W.2d at 19; *Williford v. Masten*, 521 S.W.2d 878, 884 (Tex. Civ. App.—Amarillo 1975, writ ref'd n.r.e.).

## B. Evidence

The trial spanned four days and included numerous exhibits and testimony from eleven witnesses, including:  Leticia S. Echazarreta, Raymundo Garza, Esmeralda Medina, Yvette Martinez, Adkins, Antonia Tingle, Wendell Curry, Patrick Kelly McCormick, Yolanda Bright, Dr. Sathiyaraj George, and Roel Vasquez.  The pertinent evidence adduced at trial is summarized as follows.

### 1.    Leticia S. Echazarreta

Leticia S. Echazarreta, who worked for the McAllen Police Department in its community affairs department at the time of trial, testified that she was the branch manager of the Falcon Bank.  Tingle had an interest-bearing checking account at Falcon Bank which carried a balance varying from approximately $13,000 up to $40,000.  She testified that she met Tingle in 2006 or 2007, shortly after the bank opened, when Tingle became a customer of the bank and she served as his account officer.  Echazarreta testified that Tingle was "more than a customer" and "more like our family."  She testified that he was lonely and wanted someone to talk to, and that he liked the bank employees, and often had coffee and chatted with them.  Echazarreta testified that she had "heart to

18

heart" conversations with Tingle, who visited or called the bank two or three times each week until 2010, when his visits began decreasing. Adkins frequently accompanied Tingle to the bank. Echazarreta testified that Tingle had executed a statutory durable power of attorney appointing Adkins as his agent and had also named Adkins as the beneficiary on his checking account. Echazarreta testified that she saw Adkins drive Tingle to the bank many times, both before and after the execution of the December will.

Echazarreta testified that, based on her interactions with Tingle from 2006 to 2010, she "never" had any indication that he suffered from any mental incapacity. She testified that he was very smart and handled his own investments and finances. "[H]e always knew, from the beginning to the end how much money he had, basically to the penny." Echazarreta testified that Tingle's "way of thinking" did not alter "at all" during this period. She testified that although she saw nothing deficient with regard to his mental capacity during this period, he physically deteriorated. Specifically, she testified that he occasionally seemed unsteady on his feet and seemed to lose his balance.

In 2010, Tingle called the bank and spoke to Echazarreta's assistant, Esmeralda Medina, and told her that he wanted Echazarreta to prepare a will for him. Medina told Tingle that the bank could not prepare a will for him. Echazarreta returned Tingle's telephone call and reiterated that the bank could not prepare his will for him. Tingle told her that "well, I need help." She suggested that he consult with a lawyer, and he told her he could not "because he's a friend of [Adkins]."

Shortly thereafter, on December 13, 2010, Tingle came to the bank. He drove himself and she was very concerned because "physically" he was impaired. Echazarreta testified that she ultimately agreed to type the will for Tingle and he told her what she

19

should type while occasionally referring to a paper he had brought with him. She testified that Tingle did not read the paper to her, but only occasionally referred to it because "he knew" what he was telling her. He spent approximately an hour and a half with Echazarreta and Medina that day, and they discussed politics and the weather. She believed at that time that Tingle was of sound mind. She specifically testified that when he signed the will she had prepared that he had the mental capacity to sign it and "he was all mentally there." Echazarreta testified that there was no indication that Tingle lacked "even a little bit" of mental capacity that day in comparison to the past.

Echazarreta testified that during this meeting Tingle seemed upset and angry with Adkins, and told her that Adkins had stolen gold from him. She testified that up until December, Tingle's relationship with Adkins was friendly and cordial. She testified that she didn't really believe that Adkins had stolen from Tingle because she respected and admired Adkins. She thought that Adkins was "respectful, honorable, and hard working," so she did not pursue that topic of conversation with Tingle. She asked Tingle while she was preparing the will if he wanted to change Adkins as the beneficiary on the checking account or as the designee on his power of attorney, and Tingle told her that he did not. She also asked Tingle if he thought the will would be legal, and he told her not to worry about it because "[Antonia] will know what to do with it."

A copy of the will was introduced into evidence at trial. The will provided:

> I, Everett H. Tingle, being of sound mind this December 13, 2010 wish to leave the following instructions upon my death. This will supersede any wills written prior to this date including the will written by Jose M Martinez, PC, Attorney at Law.
>
> I wish to leave the following to Antonia Tingle.
>
> • All oil well shares and royalties -Some of the names are Reef,

20

PetroMax, Del Mar Energy,

  • Silver and gold located in the safe deposit vault of Lone Star Bank in No. Glasscock

  • All silver and gold located in my apartment.

After Echazarreta typed Tingle's will, she notarized it and Medina witnessed it. When Tingle left the bank, he drove in the middle lane and was driving so slowly that cars were honking at him and Echazarreta stated that they were afraid he was going to have an accident. Echazarreta testified that she was not aware if Tingle was under medication at that time, and stated that she would have asked him about any medication if he had appeared impaired. She testified that she had no reason to question whether Tingle was mentally competent.

Shortly thereafter, Tingle again visited the bank without Adkins and Echazarreta asked him where Adkins was. Tingle told her that they were having "problems." During one of her conversations with Tingle, Tingle mentioned that Antonia told him to "get rid of" Adkins, and Tingle told Echazarreta that he responded to Antonia, "why, he's a good tenant, he pays rent." Echazarreta testified that she knew Antonia lived next to Tingle and that she had a key to his apartment.

At one point, after execution of the December will, Tingle became ill, and Adkins used the power of attorney to withdraw money from Tingle's bank account to pay for his medical care.

### 2. Esmeralda B. Medina

Esmeralda B. Medina, who worked for Falcon Bank, also testified regarding her knowledge of Tingle and his execution of the December 2010 will. In 2010, she was a financial service representative. She testified that Tingle was one of the bank customers.

21

He was a "good man," who was intelligent and frequently spoke about the war. The bank employees celebrated Tingle's birthday with him, and he often visited the bank, drank coffee, and visited with them. She thought Tingle visited the bank probably twice a month. She testified that Echazarreta was closer to Tingle than she was.

Medina testified that from 2006 to 2010 there was not a period of time when she thought Tingle had lost his mental capacity and there was never a time when she saw him that he was mentally incapacitated. She testified that when she witnessed his will, he was in "his right mental capacity." She testified that Tingle and Adkins were friends, but that Tingle said he was upset with Adkins because he had stolen a gold bar and coins from his house, and that was why Tingle was executing the new will. She saw nothing unsafe about Tingle's driving when he left that day, although she had seen him drive unsafely in the past.

### 3. Raymundo Garza

Raymundo Garza, a crime scene investigator employed with the Crime Scene Unit of the Mission Police Department, testified that on April 20, 2010, Investigator Vicente Ochoa asked him to assist him in investigating a theft at Tingle's property where Adkins was described as "a person of interest." Adkins took the investigators to his apartment where Garza photographed a three ring binder containing a will, a bag with coins, and a little red box that contained keys to a lock box. Adkins produced the bag full of coins from a bedroom closet. They took the coins to McAllen Gold and Silver to have them appraised, then all of the items were taken to the police department as evidence.

On June 29, 2010, the police released the binder, bag, and box to Tingle. Garza testified that he did not see any signs that Tingle did not understand what was happening

22

when he executed a release to obtain his property.

### 4. Yvette Martinez

Yvette Martinez, an investigator with the Mission Police Department, testified that in March 2010 she was a patrol officer when she was called to Tingle's home to investigate a burglary. Tingle informed her that someone had stolen three silver bars that he had recently shipped from New York, where they had been in storage for approximately ten years. Tingle told her that the bars weighed 67 pounds each and were worth $60,000.[4] He stored the bars in a blue box in his garage, and discovered the theft when he noticed that a ladder that was on top of the box had been moved. Tingle told her that the garage could only be opened with a key that he and his "son" had access to.

Martinez testified that Tingle was an elderly gentleman who did not seem to be suffering any mental disability but who was very upset. Martinez testified that Tingle clearly communicated to her regarding his purchase and ownership of the bars. Martinez saw no signs of forced entry. Tingle told Martinez that the only three individuals with access to the bars were himself, his "son" Adkins, and an individual named "Garcia" who had helped move the bars into the garage four months earlier.

Martinez testified that, subsequently, Adkins voluntarily came to the police department and submitted a statement regarding the silver bars. According to Martinez, "Mr. Adkin's statement implicated himself stealing from Mr. Tingle." Adkins was placed under arrest. According to the police reports, Adkins admitted to stealing rare coins, but not the silver bars, from Tingle. The police investigation detailed Adkins' sale of Tingle's coins to a local gold and silver shop. In July 2010, Tingle ultimately filed an affidavit of

---

[4] Martinez testified that the silver bars were worth $60,000 each; however, other testimony in the record indicates that figure was an approximate cumulative value for all three bars.

23

non-prosecution against Adkins, and the charges against Adkins were dismissed.

### 5.    Roel Velasquez

Corporal Roel Velasquez, a Mission police officer, testified that he investigated the theft of the silver bars.  Velasquez testified that Officer Yvette Martinez originally took the report on the burglary; however, he subsequently visited the scene.  He did not recall Adkins or anyone besides Tingle being present during the investigation at the apartment.  When they went into Tingle's apartment the day of the theft, Tingle's apartment was in disarray.  There were boxes that Tingle told the officers contained silver bars and other things of value "just thrown on the floor."

In the aftermath of the investigation, Adkins was ultimately charged with a state jail felony, theft of $1,500 or more but less than $20,000 for stealing from Tingle.  Velasquez testified that Adkins confessed he stole gold and silver coins from Tingle and spent the money on his girlfriend.  The "probable cause" affidavit reads:

> Contact was made with the defendant who volunteered to come to the Mission Police Department and discuss the case.  Before the defendant was interviewed he was read his *Miranda* Warning[5] which he understood and waived and provided a statement.  The defendant denied any involvement in the theft of the silver bars, but admitted to taking several gold and or silver coins from a closet in the [Tingle's] apartment without his knowledge and sold them at the McAllen Gold/Silver store located . . . in McAllen TX.  The defendant stated he sold the coins because he needed money [to] pay his bills.  The store owner, Mr. [Curry] provided Inv. V. Ochoa with the store records showing that the defendant took about four gold and/or silver coins to sell.  The store owner also revealed that defendant was given between $800.00 dollars and $1,000.00 dollars for each coin for a total amount of about $3,200.00 dollars.  The store owner also stated he remembers the defendant.  The victim, Mr. Tingle came to the Mission Police Department and provided a statement wanting to file charges on any person who stole the silver bars along with any of his gold and silver coins.

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 445 (1966); *Martinez v. State*, 272 S.W.3d 615, 619 (Tex. Crim. App. 2008).

24

When Adkins was making his statement, Tingle was present at the police station and stated he wished to press charges against whoever had taken his property. Velasquez testified that Tingle told him that he could not believe that Adkins would steal from him knowing that he would inherit his estate.

After the charges against Adkins were dropped and Tingle's property was returned to him, Adkins came to the police department and asked Velasquez to assist him in retrieving Tingle's 2006 will from Tingle's apartment. Characterizing this activity as a "civil assist," Velasquez accompanied Adkins to the apartments, where they spoke with Antonia, and Antonia showed Velasquez the December 2010 will in her favor. Velasquez told Antonia that she should not enter Tingle's apartment or remove anything, then left on grounds that the dispute was a civil matter.

At this time, Tingle was in a nursing home. Velasquez visited Tingle at the nursing home a couple of days later to clarify the situation regarding the 2006 will in favor of Adkins and the 2010 will favoring Antonia. Tingle recognized Velasquez and told him that he was doing "fine," except that "nobody had gone to visit him in a while." Velasquez testified that the nursing home officials had told him when he arrived for the visit that "they had just left [Tingle] there and they hadn't come by and visited him."

During the visit, Tingle told Velasquez that he intended to execute the will in favor of Antonia. Tingle told Velasquez he had told Adkins that he would drop the criminal charges against him if Adkins told Tingle where the silver bars were, or if he knew anything about them. "Mr. Tingle told me at the nursing home that when he dropped the charges, Mr. Adkins told him that he was the one that had taken the silver bars." Velasquez testified that was when he first discovered that Adkins had taken the silver

25

bars, or that he "knew exactly how they were taken." Tingle told Velasquez that the new will "was to leave [Antonia] pretty much everything or whatever belonged to him." Velasquez said that Tingle seemed sorry that Adkins had "[taken] stuff from him." Velasquez testified that both when he investigated the theft and when he visited Tingle at the nursing home, he had no doubt that Tingle was mentally competent. During the investigation, Tingle was "pretty sharp" and "was a very smart man." At the nursing home, Tingle was "still pretty sharp."

### 6. Patrick Kelly McCormick

Patrick Kelly McCormick, an assistant criminal district attorney with Hidalgo County, testified regarding Tingle's motion to dismiss the criminal charges against Adkins and Tingle's July 7, 2010 statement of non-prosecution, against Adkins which stated that "I am dropping my complaint against Mr. Adkins because I am not fully convinced he was the thief and I need his assistance as a caretaker."

### 7. Wendell Curry

Wendell Curry, the owner of McAllen Gold and Silver Exchange, testified. He had been in business for almost forty years and had a long-standing and well-established client base. He testified that Adkins was a "one or a two time customer." Adkins came to his business with a lady, whom Curry subsequently identified as Yolanda Bright, and told Curry that he had "access to some silver bars," and asked if Curry would be interested in them. Adkins told Curry that he had a "rather unique" 1,000 ounce silver bar. Curry had never been offered a 1,000 ounce silver bar in his 36 years of experience and testified that such a bar is "very, very rare." "Mr. Adkins told me that he did not own the silver bar, up front, straight out told me he didn't own it, but that he had the legal right to sell it, would

26

I be interested." Curry stated that Adkins "made it plain" that he was negotiating the sale of the bar on another's behalf. Adkins showed him his identification. Adkins returned to the store subsequently to further discuss the sale of the bar. He told Curry that the person who owned the bar was in need of money and Adkins was assisting that individual as a caregiver or a friend.

Later, Adkins brought the bar in and Curry "gave him $17,000 in cash for the bar." Curry testified that Adkins carried the bar in without difficulty. Curry believed that Bright accompanied Adkins to the store for this transaction.

Subsequently, Adkins returned to the store on another occasion and told Curry he had another silver bar for sale, but this time he requested that Curry pay for the bar with a check payable to Tingle. Curry bought that bar and wrote an August 4, 2010 check to Tingle. Curry testified that Adkins came to the store alone for this second transaction.

Adkins returned to the store some time later and told Curry that Tingle had passed away, that he was "going to inherit quite a bit of gold and silver," and that he wanted Curry to appraise it and perhaps purchase some of it. Adkins told Curry that the estate included approximately $2,000,000 in rare coins. Adkins did not thereafter return to the store.

Curry testified that after Adkins sold him the silver bars, Tingle came to the store to question the purchase and sale. Curry testified that this visit was the "only reason" he knew Tingle. Tingle's physical appearance was weak and he used a walker. Curry testified that Tingle "looked probably closer to death for a human that's living than I've ever seen." Tingle was wearing extremely short shorts with a bag "full" of urine on the outside of his clothes[6] and he smelled "awful." Curry testified that Tingle did not look like

---

[6] According to the evidence at trial, Tingle had a Foley catheter, which is defined as a thin, sterile tube inserted into the bladder to drain urine. The urine drains through the catheter into a bag which is

27

a person that was being "taken care of."

At first, Curry was disinclined to allow Tingle into the store. Tingle identified himself and asked to have a private conversation with Curry. Curry admitted Tingle to the store but did not take him to his office to speak because he smelled too bad. They had a lengthy conversation. Curry testified that Tingle was "brilliant" and that "[h]is mind was clear" and he asked "sharp, pointed questions." Curry was struck by how Tingle's physical appearance and mental aptitude differed.

Curry testified that Tingle "wanted to know if his trusted friend, Mr. Adkins, was a thief." Curry thought that Tingle did not want to believe that Adkins has stolen from him. Curry had the impression that Tingle received the money from the sale of the bars, but that Tingle thought that Adkins had taken other things and sold them to other dealers. Curry told him he did not think Adkins was a thief because Adkins explicitly stated that the bars belonged to Tingle and that Adkins was acting on Tingle's behalf. Curry testified that he normally would not remember the details of a conversation like this, except that Tingle "smelled so bad and looked so pitiful." The "net result" was that Curry thought that Tingle's concerns about Adkins had been resolved when he left the store.

Sometime thereafter, the police came to Curry's store. The police showed Curry gold and silver coins, requested Curry to appraise them, and asked him if he knew Adkins. Curry testified that most of the coins were not worth much, but one was worth $15,000. Adkins was in the back of the police car and Curry had "the impression he was under arrest." The police requested Curry's records regarding his transactions with Adkins.

---

emptied when full. EMedicineHealth, http://www.emedicinehealth.com/foley_catheter/article_em.htm (last visited June 2, 2015).

### 8.    Yolanda R. Bright

Yolanda R. Bright testified that she began working for Tingle as a provider in October 2005 through a home health care company. Bright, who was still working as a provider at the time of trial, testified that a provider goes to customers' homes and performs tasks for them, such as bathing, preparing food, cleaning their homes, or doing laundry. Bright testified that when she began working for Tingle, he was a strong, independent, elderly man with a commanding attitude. Bright testified that she did not always get along with Tingle because he had been a "commander" in the military and he gave her instructions that she believed were inconsistent with her duties.

Her supervisor with the home health care company told Bright to assist Tingle with bathing, although Bright testified that he was very strong, walked without a cane, and did not require her assistance. She worked for him seven days a week for two and a half hours daily. Meals on wheels delivered his meals. She never met any of his relatives, although she thought that Tingle had a nephew in the Dallas area. When Bright started working for Tingle, he had fifty or sixty different bottles of medication. She did not know what medical conditions that Tingle suffered from, but she knew he had mini-strokes and was on blood thinners. Bright testified that it was never her job to administer Tingle's medications and she was unaware of what medications Tingle was taking. During the duration of her employment with Tingle, Bright only recalled one time that he had to go to the hospital.

Bright testified that she stopped working for Tingle in November 2011.[7] She

_____

[7] Bright's testimony regarding the chronology of events is inconsistent with the record evidence. For instance, she testified that she worked for Tingle for five years, but if she began working for him in 2005 and quit in 2012, as indicated by her other testimony, then she worked for him for seven years. Similarly,

received a phone call that Tingle was ill and that an ambulance was at the house to take him to the hospital. She could hear Tingle yelling and screaming in the background that he did not want to go to the hospital. She last saw him when he was taken from his home on that occasion, and she did not return to work for him.

Bright testified that she met Adkins when she started working for Tingle, and that Adkins made coffee for Tingle every day. She testified that Tingle told her to ask Adkins for coffee occasionally, or that Tingle pounded on his floor with a mallet to indicate he wished Adkins to come up to his apartment. When Adkins came to the apartment, Tingle made Bright wait outside.

By a bill of exception taken outside the presence of the jury, Bright testified that Tingle told her that he thought Adkins had stolen from him. Bright testified that Adkins had not been around for a few days and she asked Tingle where he was, and Tingle told her he had been arrested. Two or three days later, Tingle told her Adkins was arrested for stealing some "bricks." Tingle told Bright that the police thought Adkins had done it, but he did not, and asked her to "get on the phone and get me a D.A. or the officers" because he "want[ed] to help [Adkins] get out." He told Bright that he did not believe Adkins had stolen from him. Bright testified that she did not know that Tingle had coins or silver in his apartment because he was a "very private man" and "he had everything locked."

In front of the jury, Bright denied that she ever went to McAllen Gold and Silver with Adkins. She stated that "me and Mr. Adkins never had anything to do with each other." She testified that she only spoke to Adkins about Tingle. Bright testified that she

---

she testified that he was taken to the hospital and she quit working for him in 2012; however, he passed away in February of 2012. Accordingly, we assume that Bright quit working for him in November 2011.

"never" spoke to Antonia.

Bright testified that in 2010, Tingle was weak and very forgetful, and often lost his "cane," wallet, and bank debit card. In December of that year, Tingle had an upper respiratory tract infection and was very forgetful. They had stopped going outside about four months previously because Tingle "could no longer handle being out there." He had to wear adult diapers with a pad. Bright testified that on December 14 of that year, she cleaned Tingle's bedroom and she found fishnet stockings and "dildos, candles, witch kind of stuff." She did not know where they came from because she cleaned often. However, Bright testified that she did not clean on a daily basis because Tingle was a "hoarder" and "a very messy person who didn't want her to clean anything." Bright also stated that, contrary to her previous testimony, her job "was to work outside."

Bright testified that she knew that Adkins had been arrested and charged with stealing from Tingle because Tingle told her. She said that Tingle did not believe that Adkins had stolen from him, but that he was "confused" about the theft.

Bright testified that she had a criminal charge for felony possession of marijuana in 2007 while she was working for Tingle. Bright testified that she was not distributing and selling marijuana and that "they didn't catch me dealing it."

### 9. Dr. Sathiyaraj George

Dr. Sathiyaraj George, Tingle's treating physician and a specialist in internal medicine, was examined outside the presence of the jury. Dr. George testified that he began treating Tingle in 2007 and that Tingle was on medication for dementia at that time. On February 3, 2010, Tingle was admitted to Las Palmas Nursing Home because of a precipitous drop in blood pressure. Dr. George testified that on admission to Las Palmas,

31

Tingle did not have the capacity to make a decision by himself. Accordingly, during the course of treating Tingle on this occasion, he signed a "do not resuscitate order" ("DNR") for Tingle at Adkins' direction because Adkins had Tingle's power of attorney. Tingle was ultimately released from Las Palmas, and Dr. George treated him after his release. Dr. George stated that he did not have an opinion as to Tingle's mental capacity after his release from Las Palmas because it was not an issue in his medical care. Dr. George testified that he could not state with a reasonable medical probability whether Tingle was mentally incompetent or not when he left Las Palmas, but that it was a "possibility."

Dr. George testified that Tingle had Alzheimer's, a form of dementia, which is a neurologically progressive disease and gets worse with time. Dr. George testified that dementia is a progressive disease which causes mental capacity to "go down slowly as years pass by." Dr. George testified that a dementia patient's mental capacity could be adversely affected by other conditions or illnesses, such as pneumonia or a urinary tract infection, which could cause a short term dip in the patient's mental capacity. Once the condition has been treated, the patient's mental capacity returns to its prior level.

Dr. George testified that "more likely than not" Tingle was incompetent in December 2010, but he "cannot tell that 100 percent" and he did not know what degree of mental impairment Tingle had. Dr. George could not testify "for sure" that Tingle was incompetent, but it was "possible." Dr. George testified it was his opinion that Tingle was incompetent in December, but conceded that he did not evaluate Tingle for mental capacity at that time. When informed that other witnesses had testified that Tingle had been visiting the bank and handling business during December and that he was "brilliant," Dr. George testified that it was "possible" that Tingle could have left Las Palmas with

32

these abilities and attributes. Dr. George further testified that there was a reasonable medical probability that Tingle was neurologically impaired; however, Dr. George testified that an individual could be neurologically impaired but still be smart and maintain their cognition. Dr. George could not state that Tingle lacked mental capacity because of his neurological impairment.

Dr. George further testified regarding Tingle's physical state. According to medical records from June 2010, Tingle had diagnoses of Alzheimer's, dementia, arthritis, chronic obstructive pulmonary disease, and osteoporosis. Tingle was homebound, unable to drive, and at high risk for falls. Tingle was incontinent, suffered joint pains, was on multiple medications, had knowledge deficits related to care of his bladder catheterization, and was dependent on assistive devices for ambulation.

The trial court ultimately ruled that Dr. George's opinion of Tingle's mental capacity in December was not admissible, but allowed Dr. George to testify before the jury about Tingle's physical problems.

In the presence of the jury, Dr. George testified that Tingle was his patient from 2007 until Tingle's death in 2012. Tingle suffered from arthritis, COPD, and lung problems and took multiple medications, including hydrocodone for pain. Dr. George testified that Adkins brought Tingle in for appointments "all the time," and that he knew Adkins because Adkins was also one of Dr. George's patients. Dr. George testified that Tingle was already taking Aricept for dementia and "memory problems" when he began treating him in 2007. He testified regarding the February 3, 2010 DNR which indicated that Tingle was not competent at that time. After his release from the nursing home on that occasion, Tingle continued to be sick and was physically impaired and needed home care from visiting

33

nurses.

### 10.   Antonia Tingle

Antonia Tingle, who was 60 years old at the time of trial and working at Wal-Mart, testified that she met Tingle in 1984 through mutual friends. They began dating, although Tingle spoke very little Spanish and she spoke only a little English. Antonia's friend served as their interpreter or they used "a Spanish-English dictionary." They ultimately moved in together and married. After being married for approximately fifteen years, they divorced in 2003.

In 2010, after the divorce, they still lived in the same fourplex. During that period of time, she had a "[v]ery good relationship" with Tingle. She testified that they were very good friends. She spoke with him regularly and daily, except when she had to go to work early in the morning. Antonia testified that the relationship between Tingle and Adkins was not good and that Tingle told her that Adkins had stolen from him. It upset Tingle because he had trusted Adkins.

Antonia also testified that on December 10, 2010, Tingle transferred the acre adjoining the fourplex to her and on December 11, Tingle transferred the fourplex to her. She took Tingle to an attorney who prepared the deeds. Antonia testified she did not know why there was a December deed conveying the fourplex to her if she previously had been awarded that property during the divorce. With regard to Tingle's mental state, she testified that he was "okay" at that time.

Tingle told Antonia that he wanted to execute a will in her name, and she told him not to do so because "he had already done one for Mr. Fred, and I didn't want any problems." Antonia testified that Tingle had also previously contemplated leaving half of

34

his estate to her and half to Adkins. Tingle asked Antonia to go with him to the bank to prepare the will, but she told him that she did not want to, so he went alone. At this time, Antonia had not noticed that Tingle was suffering from any mental disability. Antonia testified that when she got home from work that day, Tingle called her over to his apartment and showed her the will and asked her to keep it with her. He told her that he wanted to leave her his property instead of leaving it to Adkins because Adkins had stolen from him.

Tingle had asked Antonia to go see him at his apartment every day. Once, when she went to see him she found him on the floor. She could not lift him, so she called the provider to come and help. Adkins was not present. Tingle was taken to the hospital by ambulance and left her in charge of his keys. He told her to keep them until he came back, and instructed her not to allow anyone into his apartment. Tingle told Antonia that he wanted to keep his apartment closed because he didn't want Adkins to "go and get more things from me." Antonia believed this occurred in 2011. After that day, Tingle never returned to his apartment. Subsequently, Adkins came back with the police seeking access to Tingle's apartment. She showed them his apartment.

After Tingle's hospitalization, Antonia visited him at McAllen Medical Center and when he was moved to Renaissance. One day, she called the hospital and learned he had died. She had visited him the previous day. Antonia testified that she was not able to attend Tingle's funeral because she was working.

Antonia testified that Tingle was never angry with her in 2010. She denied that she had any conversations with him about her relationships or about a boyfriend. She denied that Tingle had been mad at her boyfriend who drove a Mercedes. Antonia

35

testified that she never tried to put Tingle in a nursing home.

Antonia conceded that she did not have a good relationship with Adkins in 2010. Antonia testified that she changed the lock on Adkins' apartment when he was jailed because she did not want his girlfriend or wife to steal anything from his apartment.

### 11.    Fred Newton Adkins

Adkins, a retired band director who was 69 years of age at the time of trial, testified that he began serving as Tingle's caretaker on September 4, 2005 and served in that capacity for a period of approximately seven years.

Adkins testified that Tingle did not pay Adkins for his services, because they "had an agreement at that time that I would take care of him till he passed and that I would get his assets.  And I did my job.  I was right there with him when he passed."  In 2006, Tingle had a will, medical directive, power of attorney, and other documents prepared by an attorney and a financial planner.  Adkins testified that Tingle executed them because he "wanted to leave me all his assets" and get "his estate set."  Adkins was the beneficiary of the will and was given Tingle's power of attorney.

Adkins testified that he first met Tingle in 1987 or 1988, and that he was friends with both Antonia and Tingle prior to their marriage.  Adkins ultimately married Antonia's daughter.  While the couples were married, Adkins and Antonia's daughter lived downstairs in an apartment in Tingle's fourplex, and Tingle and Antonia lived upstairs. Adkins testified that when they lived together they were "family," that they "loved each other" and that they were the "very best of friends."

Tingle filed for divorce from Antonia in 2000 or 2001 and their divorce was finalized in 2003.  Adkins testified that he did not take sides in the divorce, and it caused no friction.

36

Adkins testified that during the divorce proceedings, almost a decade previously, Antonia hit Tingle and Adkins saw Tingle's resulting bruises. According to Adkins, "they had a pretty good fight." Antonia obtained the fourplex in the divorce. She lived in one of the apartments and Tingle lived in another. Adkins divorced Antonia's daughter, then moved away for some years, then returned in January 2006. When he returned to Texas, he leased an apartment at the fourplex from Antonia and lived there until 2011.

Adkins testified that he and Antonia were "close" until approximately 2008. However, in 2008, she raised his rent and told him she wanted him to leave. According to Adkins, Antonia did not like Adkins being "close" to Tingle. Adkins testified that Antonia "worked constantly about two years trying to get me out of there" because "he loved me and I loved him" and he "was my best friend." He testified that "as long as I was there it was hard for her to manipulate him." Adkins testified that he and Antonia did not speak to each other for two to three years because "[h]alf the time she tried to throw me out, tried to get rid of me." In approximately September 2010, she tried to evict him. Adkins eventually moved out because "[Antonia] just got after me, she was just jumping on me and we just couldn't – you know, it was a hostile environment."

Adkins testified regarding the theft of the silver bars and denied that he stole the silver bars from Tingle. Adkins testified that he picked up the bars from the post office when they were delivered from New York in 2009. Adkins testified that there were eight silver bars: seven 1,000 ounce bars and one 300 ounce bar. Adkins testified that the bars were too heavy for him to get them out of the car when he retrieved them from the post office. He testified that he and Tingle called Adkins' son-in law at that time, Garcia, who assisted them in putting the bars in Tingle's garage.

37

According to Adkins, he discovered that three bars were missing when he was in the garage and noticed that a ladder had been moved from on top of the boxes containing the silver bars. Adkins testified he reported the crime on March 3, 2010 and spoke with the patrol officer. He was surprised she did not mention him in her report, and he did not know why the police report does not list him as a witness because he called to report the crime and he showed the officer around.

Adkins testified that Tingle had been in the hospital, and Adkins had previously removed some of the bars from the garage because Adkins got "a little nervous" about them. Adkins testified that he was getting "paranoid" about having the silver bars in the garage because he was worried somebody might steal them. So Adkins moved them "as best [he] could]" in a "little dolly" and put the bars in his closet. He did not move all of the silver bars "because it took it all out of me to get them down there." After the police officer left, Adkins testified that he "went down and showed [Tingle] everything" and "showed [Tingle] the bars in my closet." He then drove to McAllen Gold and Silver and told Curry that three silver bars had been stolen, so that Curry could let the authorities know if anyone attempted to sell him the bars.

Adkins testified that he voluntarily went to the police after the theft of the silver bars to give a statement. He testified that he "told them that [he] had taken a couple of coins." He took the coins while Tingle was in Renaissance Hospital for a respiratory infection and blood pressure fluctuations. He testified that Tingle kept some of his coins "[s]cattered around" in the bathtub and on the floor of the back bathroom. Adkins testified that he took the coins and was going to take them to the bank for Tingle because Tingle's place was messy and he was afraid that Antonia might steal the coins. Adkins testified that "I didn't

38

steal from Mr. Tingle. I took some coins." Adkins justified his possession of Tingle's coins on grounds that he had Tingle's power of attorney. He thought his power of attorney was "strong enough" to take the coins.

In contrast to his testimony indicating his removal of the coins was for safekeeping purposes, Adkins told the police he "had taken some coins and sold them to pay some expenses." According to Adkins, he "had to pay all the expenses" of serving as Adkins' caregiver. He testified that he filled his car with gas and took Tingle to the movies. When asked in front of the jury why Adkins took the coins, Adkins testified that Tingle "didn't buy anything" when they went out.

After giving his statement to the police, Adkins went with the police to McAllen Gold and Silver, then went to the apartment where Adkins retrieved Tingle's will, the trust, and the power of attorney. Adkins testified that the police asked if he had any more coins and he showed them some in his apartment. Adkins testified that he had opened a safety deposit box at Compass Bank when Tingle was in the hospital because he thought Antonia "was going to go through that apartment and get everything she could." Adkins did not inform Tingle that he was going to remove the coins from his apartment. Adkins testified that he placed some of the coins in the box at Compass Bank, and when Tingle returned from the hospital, Adkins took him to the bank and showed him the coins. Adkins did not return the coins at Compass to Tingle because the coins were "very safe" in the bank and he was afraid they might be taken.

Although Adkins initially denied signing the statement given to the police admitting the theft, he later admitted that he signed the statement. "I looked at it and I signed." Adkins reviewed the probable cause affidavit and did not agree that he had sold "all" of

39

the coins to McAllen Gold and Silver.

When Adkins was released from jail, the lock on his apartment had been changed, so Adkins went upstairs to see Tingle. According to Adkins, Tingle told him that he was sorry that he had locked the apartment and that he did not believe that Adkins was guilty. Adkins testified that Tingle told him he wanted him to continue acting as caretaker for him and that Adkins would see if he could "take care" of the charges for him. Adkins testified that when he came back from jail, he was "closer than ever" to Tingle, and the day he came back they hugged each other, told each other that they "loved each other," and Tingle told him he would get Adkins "out of the mess." Adkins testified that he believed that Tingle had the mental capacity to relieve him of his criminal charges, although Adkins testified that prior to that time he didn't think Tingle was "100 percent." In support of this allegation, Adkins testified that Tingle was forgetful insofar as he might forget the date or lose his debit card or his keys.

Adkins testified that the missing three silver bars were never recovered and he did not know who stole the silver bars. Adkins testified that, contrary to Curry's testimony, he and Bright never went to McAllen Gold and Silver to sell a silver bar. Adkins denied that he had a sexual relationship with Bright.

Adkins testified that in the summer of 2010, Tingle sold one of the remaining silver bars. Adkins testified that he and Tingle took a silver bar to Curry at Mission Gold and Silver to sell it because Tingle wanted to invest in an oil company using the proceeds from the sale of the bar. Adkins utilized a dolly to move one of the bars to his car and "me and Mr. Tingle struggled to get it to the back seat." According to Adkins, Tingle helped him move the bar. "[Tingle and I] both about passed out on that." They took the

40

bar to McAllen Gold and Silver and spoke with Curry, who retrieved the silver bar from the car. Tingle and Curry negotiated the sale and purchase of the bar and Adkins testified that he "wasn't' involved in the process at all." Tingle and Curry agreed on $17,000 for the bar and Curry wrote Tingle a check for the bar. The record includes a check for this amount dated August 4, 2010. Adkins testified he drove Tingle to the bank where he deposited the check.

With regard to Tingle's mental capacity, Adkins testified that Tingle knew the difference between right and wrong. Adkins testified he "really can't" tell the jury any other information to show that Tingle lacked mental capacity. Adkins testified that Tingle became more forgetful and his physical condition deteriorated as he aged. Adkins testified that Tingle's body fell apart, but that his mind did not deteriorate to a "great extent." Adkins testified that Tingle had Alzheimer's and that he believed that Tingle had been taking Aricept to treat the Alzheimer's for years. Adkins testified that Tingle had back problems and rheumatoid arthritis and was frequently in pain. He had undergone toe amputations and had a Foley catheter. Adkins assisted Tingle with the catheter and his medication, and testified that Tingle took several pills, including pain pills. Adkins testified that he did "a lot" in terms of keeping track of Tingle's medications but that Tingle's health care providers also handled his medication.

By bill of exception taken outside of the presence of the jury, Adkins testified about Tingle's mental competence in February 2010. Tingle had had been admitted to the hospital because his blood pressure dropped too low and he became extremely ill. During Tingle's admission to the hospital on February 3, 2010, Adkins executed a DNR for Tingle pursuant to Tingle's medical directive. According to Adkins, in the DNR he certified that

41

Tingle was not competent and Tingle's doctor also certified that he was not competent. Adkins testified that in his opinion, Tingle was not mentally competent when he executed the December will and that was based in part on Dr. George's signature on the DNR. Adkins testified that Tingle ultimately recovered from this medical episode. The trial court ruled that Adkins' testimony regarding the February 2010 DNR was irrelevant to Tingle's mental capacity on the day that he executed the will, some ten months later.

In the presence of the jury, Adkins testified that he believed that Antonia unduly influenced Tingle to change his will. He testified that Tingle was "never" mad at him and that they "never were mad at each other." After Tingle was released from jail, Adkins heard Antonia chatting with Tingle and asking him why he had Adkins released from jail and telling Tingle that Adkins was a "bad person" and "scum." Adkins testified that such behavior went on a lot for a long time and that Antonia was "hostile." Adkins testified that Tingle and Antonia sat outside on the balcony pretty often and sat and talked, and he heard things that "hurt [his] feelings." According to Adkins, Antonia "talked [Tingle] into" changing his will. Adkins testified that he believed that Tingle told Echazarreta and Medina he was angry because Antonia "had pushed his decision." "I think [Antonia] talked to him in bed and played with, you know, I was a bad person, I deserved to be in jail forever, maybe the electric chair." Adkins testified that otherwise, he could not think of anything that showed that Antonia unduly influenced Tingle to change his will. Adkins later testified that he saw dildos, stockings, and condoms in Tingle's apartment.

Adkins testified he saw Tingle four to six hours "almost" every day. He testified that they went walking and did things together. In December 2010, he "probably saw him every day." "Most of the time we'd have a walk to the canal, walk back, you know, coffee."

He testified that Tingle needed him to do his job for him as his "helper" every day. Adkins testified that he did not notice that Tingle was gone on the day he executed the December will at the bank because he "might have had a doctor's appointment." Adkins testified that Tingle's mental state in 2010 was "absolutely fine," however, he also testified that Tingle was not competent on the date that he signed the will. Adkins testified that Tingle was not mad at him in December 2010 and that Tingle was "never" upset" with him or displayed anger or hostility to him. Adkins stated that Tingle complained about Antonia to him occasionally. Adkins terminated his lease with Antonia at the end of December 2010. After he left, Adkins testified that he visited the fourplex every day to check on Tingle.

With regard to his testimony, Adkins stated that due to his age, he was "a little foggy" on some matters. Adkins testified that Bright was Tingle's provider for five or six years and that she washed sheets, clothes, and kept Tingle's apartment clean.

### C. Application

We first consider all of the evidence both supporting and contradicting the jury's determinations that Tingle lacked testamentary capacity. Our pivotal inquiry is whether Tingle had testamentary capacity on the date he executed the new will, December 13, 2010. *See Lee*, 424 S.W.2d at 611; *Long*, 196 S.W.3d at 464–65.

The individuals who assisted Tingle in preparing, notarizing, and witnessing the will on that day, Echazarreta and Medina, supplied direct evidence regarding Tingle's capacity on that day. Both individuals testified unequivocally that Tingle had the mental capacity to execute the will. Echazarreta testified that Tingle "knew" what he was telling her and that she believed that Tingle was of sound mind that day, that Tingle had the

43

mental capacity to sign the will when he did so, and that "he was all mentally there." Echazarreta testified that there was no indication that Tingle lacked "even a little bit" of mental capacity in comparison to the past. Medina testified that when she witnessed his will, Tingle was in "his right mental capacity."

In terms of opinion testimony from the proponent of the will, Antonia testified that when Tingle went to the bank to execute the will, she had not noticed that Tingle was suffering from any mental disability. Although Adkins offered no specific testimony regarding Tingle's capacity on the date he executed the new will at the bank, and in fact had not noticed that Tingle left the apartment on that day, he testified generally, as the contestant to the will, that he believed that he saw Tingle every day during December 2010 and, in his opinion, Tingle was not competent on the date he executed the new will.

Since there is no direct testimony in the record of acts, demeanor, or condition indicating that Tingle lacked testamentary capacity on December 13, 2010, his mental condition on that date may be determined with reference to lay opinion testimony based on the witnesses' observations of Tingle's conduct either prior to or subsequent to execution of the will. *See Lee*, 424 S.W.2d at 611.

In this regard, Dr. George testified that Tingle suffered from Alzheimer's, a form of dementia, which progressively worsens with time. Dr. George testified that Tingle was on medication for Alzheimer's when he began treating him in 2007, so Tingle had apparently had the condition for some unidentified period of years. Dr. George testified that he did not evaluate Tingle's mental capacity and speculated that it was "more likely than not," or "possible" that Tingle lacked mental capacity on December 13, 2010, but that it was also "possible" that Tingle was "brilliant." We conclude that Dr. George's

44

testimony that Tingle had Alzheimer's has probative force since it appears that the condition persisted and had some probability of being the same or worse condition at the time of the will's execution. *See id.*

In terms of other evidence regarding Tingle's acts, demeanor, and condition both before and after he executed the will, Dr. George testified that approximately ten months before executing the will, Tingle suffered an illness causing hospitalization, and that Tingle lacked mental capacity during that illness, so Dr. George signed a DNR provided by Adkins. Dr. George also testified that illnesses can cause declines in mental capacity in dementia patients; however, the dip in mental capacity is restored upon treatment or recovery from the illness. Dr. George testified that it was possible that Tingle recovered from that health episode with attributes of "brilliance."

In their dealings with Tingle both before and after the December 13, 2010 will, bank employees Echazarreta and Medina both testified that they never thought Tingle suffered from any mental capacity and that Tingle handled his business affairs well. The officers who investigated the theft of the silver bars, Garza, Martinez and Velasquez, testified that Tingle did not seem to be suffering any mental disability, communicated clearly, and seemed to understand what was happening. Velasquez testified he had no doubt that Tingle was mentally competent both during the investigation of the theft and after execution of the will when he visited Tingle in the nursing home, concluding that Tingle was "pretty sharp." Curry testified that he thought Tingle was brilliant, had a clear mind, and asked sharp, pointed questions. Tingle's provider, Bright, testified that Tingle was very forgetful and sometimes misplaced his cane, wallet, and debit card.

In terms of Tingle's capacity, Adkins testified that Tingle was not "100 percent,"

45

that Tingle was forgetful insofar as he might forget the date or his keys, and that he grew more forgetful as he aged. Adkins based his opinion that Tingle lacked mental capacity to execute the will, in part, on the February 2010 DNR, however, Adkins also testified that Tingle recovered from that medical episode. Adkins also testified that Tingle knew the difference between right and wrong and his mind did not fall apart to a "great extent." Adkins further testified that Tingle had the mental capacity to execute the July 7, 2010 statement of non-prosecution in favor of Adkins, and, according to Adkins' testimony, Tingle successfully and solely negotiated the sale of a silver bar on August 4, 2010. Adkins also testified that Tingle's mental state was "absolutely fine" in 2010.

Based on Tingle's treatment for Alzheimer's, there is a scintilla of evidence supporting Tingle's alleged incapacity, thus there is legally sufficient evidence to support the jury's verdict. However, we agree with the trial court that the evidence supporting the jury's finding that Tingle lacked testamentary capacity on December 13, 2010 is so contrary to the overwhelming weight of the evidence that the finding should be set aside. All of the direct evidence regarding Tingle's mental capacity on the day the will was executed indicates that Tingle had sufficient testamentary capacity to understand and execute the will. Based on the witnesses' testimony, who knew Tingle and had the reasonable opportunity to observe his acts, conduct, and characteristics, Tingle understood he was making a will, the effect of making that will, the general nature and extent of his property, the natural objects of his bounty and the claims upon them. *See Long*, 196 S.W.3d at 464; *In re Neville*, 67 S.W.3d at 524. Furthermore, while Tingle told Echazarreta the contents of his will while referring to a note he brought with him, she clearly testified that he knew what he was doing and thus, Tingle had sufficient memory

46

to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *See In re Estate of Blakes*, 104 S.W.3d at 336; *Horton*, 965 S.W.2d at 85.

In reversing a judgment for factual insufficiency, we must detail all the relevant evidence and explain why it is insufficient to support the judgment. *In re S.M.R.*, 434 S.W.3d 576, 586 (Tex. 2014); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The only evidence supporting the jury's determination that Tingle lacked testamentary capacity was Adkins' and Dr. George's testimony that Tingle had Alzheimer's, a form of dementia, since at least 2007. Dr. George testified that Alzheimer's is a progressive disease that causes loss of mental capacity. However, based on the record evidence, Dr. George neither diagnosed Tingle with Alzheimer's nor evaluated his mental capacity in connection with that illness, nor addressed the condition during Tingle's medical examinations. His testimony regarding the effect of the condition on Tingle's testamentary capacity was equivocal and speculative at best.

Both Adkins and Bright testified that Tingle was forgetful and lost things. There is no testimony in the record regarding the frequency with which Tingle was forgetful or lost personal items, and without more, such testimony does not suffice to carry the judgment. If the propensity to occasionally lose items or forget a date sufficed to show a loss of testamentary capacity, then the majority of the general public would lack the capacity to execute a will.

We next consider all of the evidence both supporting and contradicting the jury's determination that Tingle signed the December 13, 2010 will as a result of undue influence. We examine whether Adkins proved: (1) the existence and exertion of an

47

influence; (2) the effective operation of such influence so as to subvert or overpower Tingle's mind when executing the will; and (3) Tingle would not have executed the document but for the influence. *Rothermel*, 369 S.W.2d at 922; *In re Estate of Johnson*, 340 S.W.3d at 776.

In examining the nature and type of relationship between Tingle, Antonia, and Adkins, we note that Tingle and Antonia were married for approximately fifteen years, and while the dissolution of their marriage appeared to be contentious, they nevertheless maintained a friendship thereafter which included frequent conversations sitting together outside at the fourplex. *See In re Estate of Graham*, 69 S.W.3d at 609–10. Tingle and Adkins had been friends for almost twenty years, and Adkins had agreed to serve as Tingle's caretaker. With regard to the opportunity to exert an influence on Tingle, we note that both Antonia and Adkins had ample and equal opportunities to exert influences on Tingle regarding his testamentary intent. *See id.* In examining the circumstances surrounding the drafting and execution of the will, Tingle acted independently in going to the bank and directing Echazarreta with regard to his specific testamentary intentions. *See id.* Antonia testified that she told Tingle that she did not want to be involved with Tingle's decision to change his will on her behalf. The record does not contain any evidence that clearly speaks to the existence of a fraudulent motive on Antonia's part. *See id.* With regard to whether there was a "habitual subjection" of Tingle to Antonia's control, the record indicates that Tingle lived independently from Antonia and apparently handled the majority, if not all, of his business matters without her, and instead handled them with Adkins. *See id.* There is speculation in the record that Tingle was influenced by sex or witchcraft, but none of Adkins or Bright's testimony directly linked Antonia with

48

these allegations.

As previously discussed, Tingle showed a clear state of mind at the time the December will was executed. *See id.* Examining Tingle's mental or physical incapacity to resist or the susceptibility of Tingle's mind to the type and extent of the influence allegedly exerted by Antonia, we note that the witnesses testified that Tingle was commanding and decisive in nature, although physically weak and debilitated, and that Adkins, not Antonia, was his caretaker. *See id.* The record indicates that Tingle actively sought to discover whether Adkins had stolen from him and independently investigated the theft of the silver bars through his interview with Curry. Finally, we cannot conclude that the December will is "unnatural" in its terms of disposition of property because it favors Tingle's ex-wife and friend over a friend and caretaker, who, based upon the evidence at trial, stole from Tingle on multiple occasions.

Considering all of these factors, the evidence regarding undue influence on Tingle amounts to a mere suspicion of wrongdoing and does not produce a reasonable belief that an influence was exerted that subverted or overpowered Tingle's mind and resulted in the will. *See Rothermel,* 369 S.W.2d at 922–23. The circumstances are equally consistent with the absence of the exercise of such influence. *See In re Estate of Graham*, 69 S.W.3d at 609–10; *see also Rothermel*, 369 S.W.2d at 922. We conclude that the jury's finding that Tingle signed the will as a result of undue influence was contrary to the great weight and preponderance of the evidence.

Finally, we address the jury's finding that Antonia did not prosecute the proceeding to probate the December 2010 will in good faith and with just cause. In examining this issue, we note that the jury's finding that Antonia secured the will by undue influence does

not preclude a finding that she nevertheless, offered the will in good faith and with just cause. *Harkins*, 907 S.W.2d at 62. After reviewing the entirety of the record, we find no evidence pertaining to the issue regarding whether Antonia prosecuted the will with good or bad faith. *See Plas-Tex, Inc.*, 772 S.W.2d at 445; *Harkins*, 907 S.W.2d at 62.

Based on the foregoing, we reject Adkins' contentions that the jury's findings were reasonable and supported by the evidence at trial or that the trial court substituted its judgment for that of the jury, and we conclude that the articulated reasons in the trial court's order granting a new trial were supported by the law and the record. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d at 761–62; *see also In re Whataburger Rests. LP*, 429 S.W.3d at 598; *In re Health Care Unlimited, Inc.*, 429 S.W.3d at 602.

## V. CONCLUSION

We have concluded that the jury's findings that Tingle lacked testamentary capacity, the 2010 will was procured by undue influence, and Antonia failed to offer the will in good faith and with just cause, were not supported by factually sufficient evidence. In so holding we are cognizant that the jury was the judge of the credibility of the witnesses and the weight of their testimony, and that it was within the jury's province to resolve any inconsistencies in the evidence. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. Nevertheless, as recognized by the trial court, the evidence adduced in support of the jury's findings was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Plas-Tex, Inc.*, 772 S.W.2d at 445; *Lofton*, 720 S.W.2d at 805.

50

Accordingly, the trial court did not err in granting a new trial.  We deny the petition for writ

of mandamus.


                                               NORA L. LONGORIA
                                               JUSTICE

Delivered and filed the
23rd day of June, 2015.